**26-3090**

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

---

**VANESSA TUCKER**, et al.,
*Plaintiffs and Appellants,*

*v.*

**HARCROS CHEMICALS, INC.**,
*Defendant and Appellee.*

---

On Appeal from a Judgment of the United States District Court
for the District of Kansas, No. 2:25-cv-2569
Hon. Kathryn H. Vratil, District Judge

---

# Answer Brief of Defendant/Appellee Harcros Chemicals, Inc.

---

**STINSON LLP**
Megan McCurdy
megan.mccurdy@stinson.com
1201 Walnut, Suite 2900
Kansas City, Missouri 64106
Telephone: (816) 691-2445
Facsimile: (816) 412-1102

**STINSON LLP**
Jan T. Chilton
jan.chilton@stinson.com
595 Market Street, Suite 2600
San Francisco, California 94105
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

**ORAL ARGUMENT IS REQUESTED**

Attorneys for Defendant and Appellee Harcros Chemicals, Inc.

# TABLE OF CONTENTS

*Page*

I. INTRODUCTION ..... 1

II. STATEMENT OF THE CASE ..... 2

A. The Complaint's Pertinent Allegations ..... 2

B. Relevant Procedural History ..... 3

III. SUMMARY OF ARGUMENT ..... 5

IV. ARGUMENT ..... 8

A. Tucker Lacks Article III Standing ..... 8

1. Tucker Has Not Suffered Physical or Economic Injury ..... 9

2. Tucker Has Not Alleged Facts Showing a Certainly Impending, Imminent Risk of Harm ..... 9

3. Medical Monitoring Without Physical Injury is Not a Concrete Harm ..... 13

4. Tucker's Out of Circuit Precedent is Unpersuasive ..... 18

5. Tucker's Criticism of the District Court's Ruling for Allegedly Conflating Standing with The Merits is Misplaced and Wrong ..... 23

B. Tucker's Claim is Barred by Kansas' 10-Year Statute of Repose ..... 25

1. Tucker was Last Exposed to the Plant's Emissions in 2006, Well More Than 10 Years before She Sued ..... 26

2. Tucker's Arguments Do Not Circumvent the Statute of Repose ..... 27

a. On Its Face, The Complaint Shows Tucker's Claim is Time-Barred ..... 27

b. There is No Reasonable Doubt about What Acts Give Rise to Tucker's Claim ..... 28

c. The Kansas Product Liability Act does Not Except Tucker's Claim from the Statute of Repose ..... 30

# TABLE OF CONTENTS

*Page*

C. The Court Should Deny Tucker's Request to Certify Questions to The Kansas Supreme Court ....................35

1. The Court Should Not Allow Tucker to Seek a Fast Pass to Kansas Supreme Court Review ....................36

2. This Appeal can be Resolved on Other Grounds so the Issues for Certification are Not Determinative ....................39

3. Kansas Caselaw and Statutes Provide a Reasonably Clear and Principled Course to Resolution of the Medical Monitoring Issue Tucker Seeks to Have Certified ....................40

V. CONCLUSION ....................42

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ....................45

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Affiliated FM Ins. Co. v. Trane Co.*,
831 F.2d 153 (7th Cir. 1987) ....................37

*Afram Export Corp. v. Metallurgiki Halyps, S.A.*,
772 F.2d 1358 (7th Cir. 1985) ....................37

*Aldrich v. McCulloch Props., Inc.*,
627 F.2d 1036 (10th Cir.1980) ....................28

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ....................10

*Baker v. Croda Inc.*,
304 A.3d 191 (Del. 2023) ....................17, 41

*Ball v. City of Dodge City, Kan.*,
67 F.3d 897 (10th Cir. 1995) ....................23

*Berry v. City of Chicago*,
2020 IL 124999, 181 N.E.3d 679 ....................17, 22, 41

*Black v. Union Pac. R.R. Co.*,
No. 23-cv-1218, 2024 WL 1604620
(D. Kan. Apr. 12, 2024) .................... *25,* 26, 27, 29, 30, 35

*Boyter v. Comm'r*,
668 F.2d 1382 (4th Cir. 1981) ....................39

*Brereton v. Bountiful City Corp.*,
434 F.3d 1213 (10th Cir. 2006) ....................25

*Bridges v. Bentley by Bentley*,
244 Kan. 434, 769 P.2d 635 (1989) ....................41

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) ....................16, 41

*Buck v. Miller Amusement Co.,*
166 Kan. 205, 200 P.2d 286 (1948) ....................41

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*


*Burnham v. Humphrey Hosp. Reit Tr., Inc.*,
403 F.3d 709 (10th Cir. 2005) ....................25

*C.C. v. Med-Data Inc.*,
No. 21-cv-2301, 2022 WL 970862 (D. Kan. Mar. 31, 2022)....................13

*Cahn v. Word*,
798 Fed. Appx. 244 (10th Cir. 2020)....................40

*Cantwell v. Univ. of Massachusetts*,
551 F.2d 879 (1st Cir. 1977)....................38

*Carhartt, Inc. v. Innovative Textiles, Inc.*,
998 F.3d 739 (6th Cir. 2021) ....................37

*Caronia v. Philip Morris USA, Inc.*,
22 N.Y.3d 439, 5 N.E.3d 11 (2013)....................17, 41

*Cent. Virginia Community College v. Katz*,
546 U.S. 356 (2006)....................19

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)....................10

*City of Neodesha v. BP Corp. N. Am., Inc.*,
295 Kan. 298 (2012) ....................35

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................10, 13, 21

*Colonial Park Country Club v. Joan of Arc*,
746 F.2d 1425 (10th Cir. 1984) ....................38

*Combs v. Int'l Ins. Co.*,
354 F.3d 568 (6th Cir. 2004) ....................37

*Dayton v. Peck, Stow & Wilcox Co.*,
739 F.2d 690 (1st Cir. 1984)....................37

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.*,
746 F.2d 816 (D.C. Cir. 1984)....................17, 20

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Gietzen v. Quiet Thunder Inv., LLC*,
No. 88,449, 2003 WL 22053352 (Kan. App. 2003) ........................................32

*Gilger v. Lee Const., Inc.*,
249 Kan. 307, 820 P.2d 390 (1991) ........................................25

*Harding v. K.C. Wall Prods., Inc.*,
250 Kan. 655, 831 P.2d 958 (1992) ........................................35

*Henry v. Dow Chem. Co.*,
473 Mich. 63, 701 N.W.2d 684 (2005) ........................................17, 41

*Hinton ex rel. Hinton v. Monsanto Co.*,
813 So. 2d 827 (Ala. 2001) ........................................14, 17, 41

*Hoard v. Shawnee Mission Med. Ctr.*,
233 Kan. 267, 662 P.2d 1214 (1983) ........................................40

*Husky Ventures, Inc. v. B55 Investments, Ltd.*,
911 F.3d 1000 (10th Cir. 2018) ........................................39

*Jeanty v. Big Bubba's Bail Bonds*,
72 F.4th 116 (5th Cir. 2023) ........................................37

*Jenkins v. Amchem Prods., Inc.*,
256 Kan. 602, 886 P.2d 869 (1994) ........................................31, 34

*Jensen v. United States Tennis Ass'n*,
No. 23-15757, 2025 WL 707447 (9th Cir. Mar. 5, 2025) ........................................37

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*,
903 F.3d 278 (3d Cir. 2018) ........................................19

*Klose v. Wood Valley Racquet Club, Inc.*,
267 Kan. 164, 975 P.2d 1218 (1999) ........................................27

*Koch v. Shell Oil Co.*,
52 F.3d 878 (10th Cir. 1995) ........................................34

# TABLE OF AUTHORITIES

Page(s)

*Cases*

*Koch v. Shell Oil Co.*,
820 F. Supp. 1336 (D. Kan. 1993)....................33, 34

*Lawson v. Spirit AeroSystems, Inc.*,
135 F.4th 1186 (10th Cir. 2025)....................38, 40

*Lexington Ins. Co. v. Rugg & Knopp, Inc.*,
165 F.3d 1087 (7th Cir. 1999)....................37

*Lowe v. Philip Morris USA, Inc.*,
344 Or. 403, 183 P.3d 181 (2008)....................16, 17, 41

*Lupia v. Medicredit, Inc.*,
8 F.4th 1184 (10th Cir. 2021)....................8

*Martin v. Naik*,
297 Kan. 241, 300 P.3d 625 (2013)....................29

*Mays v. Ciba-Geigy Corp.*,
233 Kan. 38, 661 P.2d 348 (1983)....................31

*Metro-N. Commuter R. Co. v. Buckley*,
521 U.S. 424 (1997)....................14, 16

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)....................13

*Natalini v. Little,*
278 Kan. 140, 92 P.3d 567 (2004)). ....................29

*Nida v. Am. Rock Crusher Co.*,
253 Kan. 230, 855 P.2d 81 (1993)....................29

*O'Neill v. Dunham*,
41 Kan.App.2d 540, 203 P.3d 68 (2009)....................25

*In re Paoli R.R. Yard PCB Litig.*,
916 F.2d 829 (3d Cir. 1990)....................20

*Patton v. Hutchinson Wil-Rich Mfg. Co.*,
253 Kan. 741, 861 P.2d 1299 (1993)....................34

## TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Pino v. United States*,
507 F.3d 1233 (10th Cir. 2007) ........................................................36

*Potter v. Firestone Tire & Rubber Co.*,
6 Cal. 4th 965, 863 P.2d 795 (1993)....................................................14

*Redmond v. Crowther*,
882 F.3d 927 (10th Cir. 2018) ..........................................................10

*Rhynes v. Branick Mfg. Corp.*,
629 F.2d 409 (5th Cir. Unit A 1980) ..................................................37

*Rio Grande Found. v. Oliver*,
57 F.4th 1147 (10th Cir. 2023) ..........................................................18

*Salinero v. Johnson & Johnson*,
995 F.3d 959 (11th Cir. 2021) ...........................................................37

*Samarah v. Danek Med., Inc.*,
70 F. Supp. 2d 1196 (D. Kan. 1999)....................................................31

*Savina v. Sterling Drug, Inc.*,
247 Kan. 105, 795 P.2d 915 (1990)......................................................34

*Shaw v. Republic Drill Corp.*,
810 F.2d 149 (7th Cir. 1987) .............................................................37

*Sommerville v. Union Carbide Corp.*,
149 F.4th 408 (4th Cir. 2025) ..........................................19, 20, 21, 22

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016).......................................................................9, 19

*Stanley v. ConocoPhillips Pipe Line Co.*,
451 F. Supp. 2d 1286 (D. Kan. 2006)..................................................32

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)...........................................................................24

*Sullivan v. Nationwide Affinity Ins. Co. of Am.*,
842 Fed. Appx. 251 (10th Cir. 2021)...................................................40

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Swindol v. Aurora Flight Scis. Corp.*,
805 F.3d 516 (5th Cir. 2015) ....................39

*Tiger v. Verizon Commc'ns Inc.*,
No. 2:23-cv-1618, 2025 WL 437019 (W.D. Pa. Feb. 7, 2025) ....................9, 13

*Tomlinson v. Celotex*,
244 Kan. 474, 770 P.2d 825 (1989) ....................34

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .................... 10, 14, 15, 18, 19, 20, 22, 23, 24

*Tyler v. Hennepin Cnty., Minnesota*,
598 U.S. 631 (2023) ....................9

*United States v. Colo. & E. R.R.*,
882 F.3d 1264 (10th Cir. 2018) ....................8

*United States v. Jones*,
512 F. Supp. 2d 1193 (D. Kan. 2007) ....................39

*United States v. Wells*,
38 F.4th 1246 (10th Cir. 2022) ....................23

*Webster v. Fall*,
266 U.S. 507 (1925) ....................18

*Statutes*

United States Code
Title 28, section 1332 ....................3, 38

Kansas Statutes Annotated
Section 60-513 .................... 4, 25, 26, 29, 30, 33, 34, 35
Section 60-3201 ....................36, 39
Section 60-3302 ....................30, 32, 33, 34
Section 60-3303 ....................30, 33, 34
Section 60-4901 ....................41
Section 60-4902 ....................42

# TABLE OF AUTHORITIES

*Page(s)*

*Other Authorities*

W. Page Keeton, Prosser & Keeton on Torts 165 (5th ed 1984)............................16

Victor E. Schwartz & Christopher E. Appel, The Restatement (Third) of Torts Proposes Abandoning Tort Law's Present Injury Requirement to Allow Medical Monitoring Claims: Should Courts Follow?, 52 Sw. L. Rev. 512 (2024)..................................................................16

Restatement (Third) Miscellaneous Provisions, Tentative Draft No. 3, § 1_0 Medical Monitoring ..................................9, 16, 17

Wright & Miller, Federal Practice and Procedure (3d ed.) Volume 17A, Jurisdiction, section 4248 ..........................................................40

# I.

# INTRODUCTION

In 2006, plaintiff Vanessa Tucker ("Tucker") moved from the Kansas City neighborhood where she claims she was exposed to toxic emissions from a chemical manufacturing plant now owned by defendant Harcros Chemicals Inc. ("Harcros"). Despite manifesting no symptom, disease, or condition from that alleged exposure in the ensuing 20 years, Tucker filed this suit in late 2025. She seeks to hold Harcros responsible for nonroutine medical testing for her (and others like her) because, in her view, long-ago exposure to the plant's emissions increased the risk of disease.

No Kansas court has ever allowed a symptom-free plaintiff like Tucker to recover medical monitoring costs. She nevertheless filed this suit in federal district court and quickly asked the district court to certify questions arising from her unprecedented claim to the Kansas Supreme Court. Things didn't work out as Tucker had hoped. The district court dismissed, holding Tucker lacked Article III standing and that her claim was time-barred by Kansas' statute of repose. The district court also denied Tucker's request to certify questions to the Kansas Supreme Court, stating that the principal question for certification was not dispositive and that Kansas law was not unsettled; it was just contrary to Tucker's position.

Now Tucker asks this Court for a redo. The Court should simply say "no." As shown below, the district court correctly granted Harcros' motion to dismiss on both

Article III and statute of repose grounds. Moreover, the district court correctly denied Tucker's request to certify any questions to the Kansas Supreme Court. Tucker's arguments to the contrary lack merit. This Court should affirm the appealed order and deny Tucker's motion to certify.

## II.

## STATEMENT OF THE CASE

### A. The Complaint's Pertinent Allegations

According to the complaint, Harcros is the latest in a series of owners of a chemical plant in Kansas City, Kansas. I App. 16, ¶ 1; I App. 21 ¶¶ 22, 23. There, Harcros uses ethylene oxide ("EtO") "in 'ethoxylation,' a chemical process in which ethylene oxide reacts with alcohols, acids, or other substrates to create ethoxylates. These compounds are the building blocks for a wide range of commercial and household products, including detergents, surfactants, emulsifiers, wetting agents, dispersants, and antifoam agents." I App. 43 ¶ 119. "Ethoxylation is, by its very nature, an incomplete reaction. A portion of EtO always remains unreacted." I App. 43 ¶ 121.

Tucker insists Harcros' plant lacks "adequate controls to capture or destroy unused EtO and other carcinogens it uses . . ." I App. 45 ¶ 128. Tucker claims those chemicals escape into the air around the plant and expose neighboring communities to unsafe levels of EtO and other toxic chemicals at concentrations exceeding

accepted health-based standards and subject them to a heightened risk of chronic or life-threatening illness. I App. 44-45 ¶¶ 123-129, I App. 59 ¶¶ 176, 178. Tucker says she was exposed to Harcros' plant's emissions prenatally, and from her birth in 1977 until 2006 when she moved away. I App. 20-21 ¶¶ 16, 17, 19. During that period, she lived within 1.5 miles of the plant. I App. 20 ¶ 17. Tucker claims that due to her prolonged exposure to the plant's emissions, she has "an increased health risk profile," even though she has not developed, and may never develop, any chronic condition or disease. I App. 21 ¶ 20.

## B. Relevant Procedural History

Tucker filed her complaint in federal district court on October 1, 2025, invoking the court's diversity jurisdiction under 28 U.S.C. § 1332(d). I App. 15, I App. 33 ¶ 77. Tucker purported to bring the suit on her own behalf and on behalf of a putative class of those who resided or attended school within a 2.5-mile radius of the plant at any time after December 1960, had one or more years of exposure, and had ***not*** been diagnosed with any of a list of medical conditions. I App. 49-50 ¶ 139. The complaint pled a single claim, "under the emerging legal standards articulated by many states" (other than Kansas) for "injunctive and equitable relief through a court-supervised medical monitoring program to detect and mitigate future harm associated with exposure to toxic chemicals emitted from the [plant]." I App. 58 ¶¶ 174, 175.

Harcros and the four other defendants (two prior owners of the plant and two of their parent corporations) filed separate motions to dismiss. I App. 164, 167, 184, 187, 202, 205, 223, 225, 235, 238. Tucker opposed the motions. I App. 258, II App. 282, 306. Defendants filed replies. II App. 326, 339, 346.

The district court dismissed on April 9, 2026. II App. 354, 356, 359, 362, 364. The order granting Harcros' motion to dismiss stated that the court granted the motion substantially for the reasons set out in Harcros' moving and reply memoranda. II App. 354. It also stated:

> Between plaintiff's failure to allege any injury in fact and the Kansas statute of repose, K.S.A. § 60-513(b), plaintiff has no legally cognizable injury which is sufficient to create standing under Article III of the Constitution. As a result, the Court lacks jurisdiction to consider her claims.

*Id.*

The order also denied Tucker's request for certification of the question "whether Kansas should recognize a remedy for increased disease risk from toxic exposure without a current diagnosable injury" to the Kansas Supreme Court because "(1) the Court lacks subject matter jurisdiction and (2) unless the Kansas Supreme Court were to also re-invent the statute of repose, plaintiff would still have no legally cognizable injury." *Id.*

The order also states that the court would not certify the question as a matter of discretion because:

> (1) Kansas law is not necessarily unsettled or unclear, it is simply contrary to plaintiff's position; (2) certification is a time-consuming and expensive process, and this Court has serious questions whether the Kansas Supreme Court would wade into this issue (which is perhaps more properly one for the Kansas legislature than the Kansas Supreme Court); (3) on this record, because of the statute of repose, creating a cause of action for medical monitoring would not necessarily benefit this plaintiff and (4) failure to certify at this stage does not prevent the Tenth Circuit Court of Appeals, to which this ruling is inevitably destined, from taking another look at whether to certify.

II App. 354-355.

Tucker filed her notice of appeal on May 1, 2026. II App. 367.

## III.

## SUMMARY OF ARGUMENT

The Court should affirm because Tucker lacks Article III standing. She has not suffered any injury, let alone a concrete one. Tucker has no manifested disease, condition, or symptoms caused by her exposure to the plant's alleged emissions. Tucker also has not incurred any cost for nonroutine medical testing. Tucker is not at risk of suffering an imminent injury, either. Her fear that she has a higher risk of developing a disease or condition in the future does not confer Article III standing. She has gone 20 years since her last exposure without testing or manifested physical harm. She alleges no facts to show that despite her lengthy symptom-free existence, the risk of emission-caused illness is certainly impending.

The cost of additional medical testing, which Tucker claims is necessitated by

her exposure to emissions from the plant, also fails to confer Article III standing. Medical testing or monitoring is a preventive measure and, so, would give Tucker standing only if the risk to be prevented were certainly impending. But it is not.

Also, the need for medical monitoring absent a manifestation of physical injury is not an intangible harm that has been elevated to the status of a legally cognizable injury by Congress or Kansas' Legislature. Nor is it a type of intangible injury which has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts. As Tucker alleges, a claim for medical monitoring absent present symptoms is, at best, "an emerging trend"—just the sort of "contemporary, evolving beliefs about what kinds of suits should be heard" which federal courts are *not* invited to accommodate by loosening Article III's standing requirement.

Even if Article III standing did not get in her way, Tucker's claim is also barred by Kansas' 10-year statute of repose. As Tucker alleges, she was last exposed to the plant's allegedly toxic emissions in 2006. Under Kansas law, the repose period begins with the defendant's act giving rise to plaintiff's claim. Tucker's claim arises from her exposure to the plant's emissions. So, Harcros' last act that could have given rise to Tucker's claim was an emission from its plant in 2006, the last date Tucker alleges exposure to the plant's emissions. Tucker filed this suit in the last quarter of 2025, nearly 20 years later—far past the expiration of the statute of

repose.

The Kansas Product Liability Act ("KPLA") does not offer Tucker any escape from the statute of repose. Tucker does not allege that Harcros manufactured or sold the emissions—the "relevant product" on which she bases her claim. Rather, Tucker alleges that the emissions are an improperly controlled byproduct of Harcros' manufacturing of *other* products that Tucker does not allege that she bought, used, was exposed to, or was harmed by. Hence, Harcros was not a "manufacturer" or "product seller," and Tucker's claim is not a "product liability claim" within the KPLA's definitions. For that reason, neither of the KPLA sections Tucker cites apply to her.

There is no reason to burden the Kansas Supreme Court with Tucker's certification requests. As an initial matter, Tucker could have filed in Kansas state court if she wanted to convince Kansas courts to join the "emerging trend" of jurisdictions recognizing medical monitoring cases. Instead, she sought to use the federal courts as a shortcut. The Court should be cautious about allowing the use of federal diversity jurisdiction and Kansas' certification procedure as a vehicle to bring an untested legal theory before the Kansas Supreme Court in an effort to expand the state's tort law beyond its current boundaries.

But certification is also substantively unnecessary. The main issue Tucker seeks to certify is not determinative if this Court finds either that Tucker lacks Article

III standing or that her claim is time-barred. Further, as the district court explained, certification is improper because Kansas law is not unsettled or unclear, it is simply contrary to Tucker's position. Kansas has long adhered to the "no injury, no tort" rule. The same year as Tucker's last alleged exposure, the Kansas Legislature strongly re-emphasized that rule in the Silica and Asbestos Claims Act. The Act defines such claims to include suits for medical monitoring costs, and it provides that no such claim may be brought absent "physical impairment as a result of a medical condition."

## IV.

## ARGUMENT

### A. Tucker Lacks Article III Standing

"Article III standing is a fundamental requirement for any party seeking relief in federal court." *United States v. Colo. & E. R.R.*, 882 F.3d 1264, 1269 (10th Cir. 2018) (citation omitted). Thus, "[b]efore reaching the merits, [this Court] must consider whether [Tucker] has standing to pursue her claims in federal court." *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1190 (10th Cir. 2021) (citation omitted). "To have standing, a plaintiff must show that she (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. Injury in fact, the first of the three elements, requires that a plaintiff has suffered an invasion of a legally protected

interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* (*quoting Spokeo, Inc. v. Robins*, 578 U.S. 330, 338-39 (2016)) (internal quotes omitted). As the district court correctly found, Tucker cannot satisfy the first requirement.

**1. Tucker Has Not Suffered Physical or Economic Injury**

Tucker has not suffered any physical or economic harm from her exposure to allegedly toxic gases emitted from Harcros' plant. Tucker concedes that she has not developed any chronic condition or illness. I App. 21 ¶ 20. She does not allege any physical manifestation resulting from her exposure to the emissions. While Tucker now argues otherwise, Appellant's Opening Brief ("AOB"), 19, she never alleged she incurred any "pocketbook injury sufficient to give her standing." *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023). While she contends that costly non-routine medical testing is advisable given her history of exposure, Tucker does not claim that she has actually undergone—or paid for—any testing herself. I App. 21 ¶ 21, 34 ¶ 80, 53 ¶ 150; *see also Tiger v. Verizon Commc'ns Inc.,* No. 2:23-cv-1618, 2025 WL 437019, at *6 (W.D. Pa. Feb. 7, 2025) (Since the plaintiff alleging a medical monitoring claim "did not go to the doctor or incur any medical expenses, there can be no economic injury.").

**2. Tucker Has Not Alleged Facts Showing a Certainly Impending, Imminent Risk of Harm**

Tucker contends she has Article III standing because her "exposure to

[Harcros'] toxic emissions [has] create[d] a present, unjustified increased risk of latent disease." I App. 53, ¶ 180. True, "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, ***at least so long as the risk of harm is sufficiently imminent and substantial***." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021) (citations omitted; emphasis added). But that isn't enough *here*; Tucker failed to allege an actual (as opposed to hypothetical) imminent and substantial injury. To meet that standard, the risk of a "threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 (2013).[1] "'Allegations of *possible* future injury' are not sufficient." *Id.* "The plaintiff must show that [s]he 'is immediately in danger of sustaining some direct injury' … and the … threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' " *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (citations omitted); *see also Redmond v. Crowther,* 882 F.3d 927, 942 (10th Cir. 2018).

Tucker has not alleged facts showing the risk of harm from her exposure to Harcros' allegedly toxic emissions is "certainly impending." True, the complaint cites studies stating "occupational exposure to ethylene oxide ("EtO") may increase the frequency of mutations" and that EtO is "carcinogenic to humans." I App. 22 ¶

[1] *See also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

94, I App. 23 ¶¶ 99-101. The complaint also alleges that there is "evidence of carcinogenic, mutagenic, and reproductive hazards associated with EtO," evidence "linking EtO exposure to increased risk of" various cancers, and evidence that exposure to EtO during pregnancy may triple the rate of spontaneous abortion. I App. 22 ¶ 95, I App. 24 ¶¶ 102-104.

But these allegations show, at most, that a person exposed to EtO may have an increased risk of certain conditions. Missing, however, is any quantification of that risk or any facts showing the likelihood that anyone, let alone Tucker, will ever suffer any harm because of her alleged exposure. Tucker's strongest allegation is that "over a lifetime" exposure to a slight amount of EtO "is associated with a one-in-a-million risk of getting cancer," a risk that "is thought to be doubled or even higher when exposure occurs before the age of 16." I App. 18 ¶ 11. A hypothetical one- or even ten-in-a-million lifetime risk is not "real and immediate" or "certainly impending." Moreover, though Tucker may have been exposed to higher concentrations of EtO, she left the exposure area 20 years ago. I App. 20 ¶ 17. She has not been exposed to EtO "over a lifetime."

Finally, Tucker has suffered no harm for 20 years since her last exposure. I App. 20 ¶ 17, I App. 21 ¶ 20. The complaint does not allege any facts suggesting it's possible, let alone common, for an exposure to cause such a delayed onset for any of the harms associated with EtO exposure. Tucker certainly does not allege any

likelihood that a person who has been symptom-free for as long as she has been, will later develop an EtO-related disease or condition. Nor has Tucker alleged any facts linking her allegedly increased risk of disease to exposure during the last 5 of the 29 years of her residency in the exposure area—the only period during which Harcros owned the plant. I App. 20, ¶ 17, I App. 68 ¶ 30.

Contrary to Tucker's argument, AOB, 16, 20, the facts she alleges are not like those in *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 154 (2010). In that case, the plaintiffs provided a factual basis to conclude there was a high probability that Monsanto's product would harm plaintiffs' alfalfa. Plaintiffs specifically demonstrated that bees could pollinate plaintiffs' "organic" alfalfa *and* alfalfa grown by farms using Roundup's product. *Id.* at 153 & n. 3. This, as plaintiffs argued, created a "substantial risk of gene-flow injuries" requiring the plaintiffs to incur additional costs to continue marketing their alfalfa seeds as non-GMO products. *Id*., at 154-55.

Tucker has not alleged facts showing she faces a "substantial risk" of future disease from her 5-year exposure to Harcros' allegedly toxic emissions. And, unlike *Geertson Seed*, Tucker has not shown that she must undergo medical testing to continue living her life. She has, after all, gone without that testing for the last 49 years without any adverse effect.

### 3. Medical Monitoring Without Physical Injury is Not a Concrete Harm

Tucker also claims she has Article III standing because her exposure to toxic emissions "necessitates immediate and ongoing medical intervention" through costly, non-routine diagnostic testing. I App. 34 ¶ 80. This theory of standing cannot succeed for two reasons.

*First*, preventive measures against the risk of future harm confer Article III standing only when the averted risk is "certainly impending." In *Clapper*, the Supreme Court rejected the "contention that [plaintiffs] have standing because they incurred certain costs as a reasonable reaction to a risk of harm." *Clapper*, 568 U.S. at 416 (citations omitted). As the Supreme Court explained, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.*; *see also C.C. v. Med-Data Inc.,* No. 21-cv-2301, 2022 WL 970862, at *7-8 (D. Kan. Mar. 31, 2022).[2]

Medical monitoring is a preventive measure. Its only purpose is to detect disease sooner so that earlier, more effective treatment may be given, thereby reducing the health risks associated with exposure to toxic substances. *See Tiger v. Verizon Commc'ns Inc.,* No. 2:23-CV-1618, 2025 WL 437019, at *5 (W.D. Pa.

---

[2] "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Clapper,* 568 U.S. at 416.

Feb. 7, 2025) (Plaintiff "is seeking medical monitoring—the very purpose of which is to be preventative of future injuries.").[3] The asserted need for medical monitoring cannot confer Article III standing because, as discussed, pp. 9-12, Tucker has not alleged any "certainly impending" harm she seeks to avoid. This is an instance in which "'[s]cience may well counsel medical intervention with respect to a known health risk long before it reaches the point where the law would regard its occurrence as 'reasonably certain.'" *Potter*, 6 Cal.4th at 1008, 863 P.2d at 824 (citation omitted).

*Second*, *TransUnion* teaches that Article III standing for an intangible harm, like the intangible need for medical monitoring, depends on (a) whether Congress has "elevate[d] to the status of [a] legally cognizable injur[y a] concrete, *de facto* injur[y] that [was] previously inadequate in law," or (b) "whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion,* 594 U.S. at 424-26. Tucker does not claim that Congress has "elevated" the need for medical

[3] *See also Metro-N. Commuter R. Co. v. Buckley*, 521 U.S. 424, 443 (1997) (*Buckley* "points out that providing preventive care to individuals who would otherwise go without can help mitigate potentially serious future health effects of diseases by detecting them in early stages."); *Hinton ex rel. Hinton v. Monsanto Co.,* 813 So. 2d 827, 830 (Ala. 2001) (Plaintiffs' theory is that with "a medical-monitoring program, an illness will eventually be detected and perhaps some of the more serious effects of the illness can be avoided by early detection."); *see also Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1008, 863 P.2d 795 (1993) (emphasizing "the value of early diagnosis and treatment for many cancer patients").

monitoring to the status of a legally cognizable injury. And, even if a state's legislature could "elevate" *de facto* injuries to Article III status,[4] Kansas' legislature has not done so with respect to medical monitoring. The Kansas Legislature has not authorized any free-standing claim for medical monitoring. *See* AOB, 38 (contending that no Kansas statutes apply to issue of medical monitoring claims); *see also* pp. 41-42 below.

Nor does Tucker seek relief from an injury that "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion,* 594 U.S. at 424-26. *Transunion* directs courts to "history and tradition" for "meaningful guid[ance on] the types of cases that Article III empowers federal courts to consider," the "inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *TransUnion*, 594 U.S. at 424. And while "an exact duplicate in American history and tradition" is not required, federal courts enjoy "no open-ended invitation … to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *Id.* at 424-25.

---

4 The Supreme Court has yet to address this issue directly. While the Court has emphasized the "due respect" owed "to Congress's decision[s]," it remains questionable whether the same degree of deference would extend to state legislation, given that state legislatures—unlike Congress—are not one of the three co-equal branches of the federal government established by the U.S. Constitution. *TransUnion,* 594 U.S. at 425.

Tucker has not tried to identify any "close historical or common-law analogue for [her] asserted injury." *See* AOB, 19-26; App. 274-275, 298-299. There is a simple reason for her silence: there is no historical analogue for a medical monitoring claim absent a manifest physical injury.[5] Instead, "[n]o injury, no tort, [has been] an ingredient of every state's law." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002) (citations omitted). That limitation reflects the historical development of American tort law:

> "Since the action for negligence developed chiefly out of the old form of action on the case, it retained the rule of that action, that proof of damage was an essential part of the plaintiff's case. Nominal damages, to vindicate a technical right, cannot be recovered in a negligence action, where no actual loss has occurred. The threat of future harm, not yet realized, is not enough. Negligent conduct in itself is not such an interference with the interests of the world at large that there is any right to complain of it, or to be free from it, except in the case of some individual whose interests have suffered."

*Lowe v. Philip Morris USA, Inc.*, 344 Or. 403, 410, 183 P.3d 181, 184 (2008) (*quoting* W. Page Keeton, Prosser & Keeton on Torts 165 (5th ed 1984)).[6]

---

[5] *See Buckley,* 521 U.S. at 440-41 (finding no common-law support for "a full-blown, traditional tort law cause of action" "authorizing recovery for medical monitoring in the absence of physical injury").

[6] "The existence of an injury has traditionally served as the linchpin for tort liability." Victor E. Schwartz & Christopher E. Appel, The Restatement (Third) of Torts Proposes Abandoning Tort Law's Present Injury Requirement to Allow Medical Monitoring Claims: Should Courts Follow?, 52 Sw. L. Rev. 512, 513 & n. 3 (2024) (fn. omitted). "For more than 200 years, a basic tenet of recovery in tort has

(Fn. cont'd)

In Tucker's words, medical monitoring is "an emerging legal standard" adopted by only half or fewer of the jurisdictions that have considered it. I App. 58 ¶ 175; Restatement (Third) Miscellaneous Provisions, Tentative Draft No. 3, § 1_0 Medical Monitoring, Cmt. a & Reporter's Note to Cmt. a,[7] Cmt. b, Reporter's Note

---

been that liability should be imposed only when an individual has sustained an injury. … Medical monitoring cases brought by asymptomatic plaintiffs propose to abandon the present injury requirement by permitting recovery based on the mere possibility of a future injury. *Id.*, at 530-31 (fn. omitted); *see also Hinton ex rel. Hinton v. Monsanto Co.,* 813 So. 2d 827, 829, 831-32 (Ala. 2001) ("Alabama law has long required a manifest, present injury before a plaintiff may recover in tort" and "provides no redress for a plaintiff who has no present injury or illness."); *Smith v. Terumo BCT, Inc.*, 2025 COA 85, ¶ 33, 581 P.3d 1220, 1227 (Col. App. 2025) (Rejection of medical monitoring claim is consistent with "Colorado's longstanding rejection of tort claims based on the potential of future physical harm."); *Baker v. Croda Inc*., 304 A.3d 191, 196 (Del. 2023) ("[A] future risk of illness without any present injury does not constitute an injury-in-fact in tort under Delaware law."); *Berry v. City of Chicago*, 2020 IL 124999, ¶ 33, 181 N.E.3d 679, 688 ("The long-standing and primary purpose of tort law is not to punish or deter the creation of this risk but rather to compensate victims when the creation of risk tortiously manifests into harm."); *Henry v. Dow Chem. Co*., 473 Mich. 63, 76, 701 N.W.2d 684, 690 (2005) ("The requirement of a present physical injury to person or property" "has always been an implicit part of a negligence action in Michigan."); *Caronia v. Philip Morris USA, Inc*., 22 N.Y.3d 439, 446, 5 N.E.3d 11, 14 (2013) ("A threat of future harm is insufficient to impose liability against a defendant in a tort context [citation]. The requirement that a plaintiff sustain physical harm before being able to recover in tort is a fundamental principle of our state's tort system [citations]."); *Lowe v. Philip Morris USA, Inc*., 344 Or. 403, 183 P.3d 181, 187 (2008) ("Following our precedents, we hold that negligent conduct that results only in a significantly increased risk of future injury that requires medical monitoring does not give rise to a claim for negligence.").

[7] "Neither the first nor Second Restatements of Torts addressed medical monitoring because such claims did not emerge until after the completion of the Second Restatement" "as the first case to recognize such a claim, *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C. Cir. 1984), postdates

(Fn. cont'd)

to Cmt. b. & App. Thus, medical monitoring is the epitome of "contemporary, evolving beliefs about what kinds of suits" may be heard—not at all the sort of claim "'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion,* 594 U.S. at 424-26.

In short, Tucker's claimed need for medical monitoring does not satisfy either of *TransUnion's* tests for concrete injury sufficient to confer Article III standing. Neither Congress nor the Kansas Legislature has "elevated" that purported harm to the status of a legally cognizable injury. And there is no historical or common-law analogue for such a claim.

**4. Tucker's Out of Circuit Precedent is Unpersuasive**

Tucker argues that this Court should simply follow other Courts of Appeals whose decisions, she claims, have uniformly held, expressly or *sub silentio*,[8] that plaintiffs alleging medical monitoring claims have Article III standing. AOB, 21, 23-26. The argument ignores this Court's "independent duty to ensure [itself] of [its] own jurisdiction." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1165 (10th Cir.

---

the Second Restatement's publication." Restatement, § 1_0, Cmt. a & Reporter's Note to Cmt. a.

[8] Decisions that address the substantive merits of a medical monitoring claim without the parties or the court addressing Article III standing are not authority on that unaddressed issue. *See* AOB, 24-25. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925).

2023). The Court cannot discharge that duty by blindly following other Courts of Appeals. That is particularly true where, as here, there is good reason to question those earlier decisions.

First, except for *Sommerville v. Union Carbide Corp.*, 149 F.4th 408 (4th Cir. 2025), the decisions Tucker cites were decided before the Supreme Court clarified the concrete injury requirement for Article III standing in *Spokeo* and *TransUnion*.[9] None of the cited cases, *Sommerville* included, apply *Spokeo's* or *TransUnion's* tests for Article III standing. None of them cite any state or federal legislation elevating the need for medical monitoring to the status of a legally cognizable injury. None of them cite a historical or common-law analogue for a tort claim not based on an infliction of actual bodily harm or property damage. In sum, none undertakes the rigorous analysis required of this Court to resolve the standing issue.

Second, all the cited decisions, again including *Sommerville*, relied heavily on the fact that the state whose law was applied had recognized a standalone cause of action for medical monitoring or was predicted to do so. *See, e.g.*, *Sommerville*, 149 F.4th at 419 ("West Virginia law permits Sommerville to seek recovery for this

---

9 Tucker does cite *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 281-82 (3d Cir. 2018) which was decided after *Spokeo*, but that case contains only a two-sentence reference to "other economic theories that might confer Article III standing" which the plaintiff did *not* allege. *See* AOB, 23-24. So, it does not hold—or suggest—that medical monitoring does, in fact, confer Article III standing. *See Cent. Virginia Community College v. Katz*, 546 U.S. 356, 363 (2006).

harm …”);[10] *In re Paoli R.R. Yard PCB Litig*., 916 F.2d 829, 850 (3d Cir. 1990) (“*Martin* does not lead us to believe that Pennsylvania would not recognize a claim for medical monitoring ….”); *Friends for All Child., Inc. v. Lockheed Aircraft Corp.,* 746 F.2d 816, 825 (D.C. Cir. 1984) (“[W]e believe that the District of Columbia Court of Appeals would recognize such a cause … for diagnostic examinations ….”). As Harcros will explain, pp. 40-42, there is no reason to believe that Kansas, would recognize a claim for medical monitoring.

Moreover, as *TransUnion* has now made clear, Article III standing is not properly determined by a state’s recent, or possible future, recognition of a new cause of action for medical monitoring. Rather, the proper “inquiry asks whether plaintiffs have identified a close ***historical*** or ***common-law*** analogue for their asserted injury.” *TransUnion*, 594 U.S. at 424 (emphasis added). Recall, “federal courts enjoy “no open-ended invitation … to loosen Article III based on contemporary, evolving beliefs about what kinds of suits” may be brought. *Id.* at 424-25. Surely, if federal courts “‘cannot treat an injury as “concrete” for Article III purposes based only on Congress’s say-so,’” *TransUnion,* 594 U.S. at 426, they cannot do so based on what a state court or legislature says. The proper focus is on

---

[10] *See* App. 274 (“The case of *Sommerville* is instructive. In that case, the Fourth Circuit rejected the argument that ***a recognized state-law medical monitoring claim*** fails for lack of Article III standing, ***so long as state law recognizes the claim*** and the plaintiff demonstrates sufficient exposure to warrant present medical necessity.”) (emphasis added).

harms historically or "'traditionally' recognized as providing a basis for a lawsuit in American courts" because those were the types of cases that the Constitution's framers consigned to Article III courts, not innovative claims first conceived two centuries or more later.

Third, none of the cited cases, *Sommerville* included, properly analyze medical monitoring as a preventive measure. As already shown, pp. 13 -14, under *Clapper* a preventive measure's cost can confer Article III standing only when the risk sought to be avoided is "certainly impending." *Clapper*, 568 U.S. at 416. None of Tucker's cases assess whether the risk that medical monitoring is designed to avert or ameliorate is "certainly impending."

Fourth, *Sommerville* and several of the other decisions draw a purported distinction between the present economic harm of paying for medical monitoring and the admittedly too speculative risk of future disease. *See, e.g.*, *Sommerville,* 149 F.4th at 419. As noted, Tucker has not alleged she has paid for any medical test, so she has no present economic harm. But, more fundamentally, *Sommerville* adopts a distinction without a difference. As the Illinois Supreme Court has explained:

> Simply pleading a need for medical monitoring prompts the question: Why is medical monitoring needed? Plaintiffs themselves allege in their complaint that the need for medical monitoring is based on "their increased risk of harm." Without an increased risk of future harm, plaintiffs would have no basis to seek medical monitoring. In other words, plaintiffs' allegation that they require "diagnostic medical testing" is simply another way of

> saying they have been subjected to an increased risk of harm. And, in a negligence action, an increased risk of harm is not an injury.

*Berry v. City of Chicago*, 2020 IL 124999, ¶ 37, 181 N.E.3d 679, 689 (citation omitted). *Sommerville* erroneously adopted this circular reasoning.

Finally, *Sommerville* found Article III standing because West Virginia's recognition of a standalone medical monitoring claim is "grounded in the 'traditional common-law principle[ ]' of 'avoiding physical injury.'" *Sommerville*, 149 F.4th at 419 (citations omitted). Such a general principle swallows the *TransUnion* rule.

Like Tucker, the *TransUnion* class members argued that they had Article III standing because of the "material risk" that their inaccurate credit reports might be disseminated in the future. *TransUnion,* 594 U.S. at 435. If resorting to a general common law principle of avoiding injury were enough, the High Court would have held that the 6,332 class members whose credit reports had not been disseminated (but could be) had Article III standing. But still, *TransUnion* held they did not suffer a concrete injury.[11] *Id.* at 435-36.

*TransUnion* demands a more refined focus on whether the common law traditionally allowed a remedy for the type of harm that the plaintiff asserts.

---

[11] *TransUnion* rejected the argument, in part, because the class members sought damages, not injunctive or other prospective relief. *TransUnion,* 594 U.S. at 435-37. But *Sommerville*, too, sought damages, not an injunction. *Sommerville*, 149 F.4th at 416. So *Sommerville* is still inconsistent with *TransUnion's* holding and reasoning.

*TransUnion,* 594 U.S. at 425, 434-35. And, recall, the common law did not do so for medical monitoring absent a manifestation of physical injury. *See* pp. 15-18 above.

### 5. Tucker's Criticism of the District Court's Ruling for Allegedly Conflating Standing with The Merits is Misplaced and Wrong

Tucker rounds out her Article III standing arguments by criticizing the district court for "flatly conflat[ing] standing with the merits, at Harcros's invitation." AOB, 21-23. That criticism is misplaced and wrong.

First, this Court reviews Article III standing *de novo*, so criticism of the district court's reasoning is unavailing to Tucker. The Court will affirm despite any mistaken reason stated for a correct result. *See Ball v. City of Dodge City, Kan.,* 67 F.3d 897, 899 (10th Cir. 1995).

Second, Tucker invited that supposed error and so cannot complain of it on appeal. *United States v. Wells*, 38 F.4th 1246, 1255 (10th Cir. 2022). Tucker specifically argued that Kansas law formed the answer to the standing question. I App. 273 ("Standing and Other Rule 12 Issues Rise or Fall With the Kansas-Law Answer."). I App. 274 ("If Kansas Recognizes Medical Monitoring, Article III Injury Is Established."); I App. 275 ("If Kansas determines that medical monitoring is categorically unavailable without present-diagnosable injury, … there would be little justification for delving into constitutional intricacies regarding whether the asserted injury is 'concrete' enough.")

Third, while "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998), whether Kansas or Anglo-American common law more generally has traditionally recognized a claim for recovery of medical monitoring costs absent physical impact lies at the very heart of the Article III standing issue here. "[W]ith respect to the [Article III] concrete-harm requirement in particular, … courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion,* 594 U.S. at 424.

*TransUnion* held that the 6,332 class members lacked Article III standing because they could not establish a key element of the traditional claim for damage to reputation: publication. *Id.* at 433-34 ("[T]here is 'no historical or common law analog where the mere existence of inaccurate information, absent dissemination, amounts to concrete injury.'"). In the same way, the district court correctly held that Tucker lacks Article III standing because she, too, cannot establish a key element of a traditional personal injury claim: actual or imminent bodily harm. *See* II App. 354, 359 (Tucker lacks Article III standing because she "fail[s] to allege any injury in fact, [and] … Kansas has never recognized a free-standing cause of action for medical monitoring ….")

In short, the district court correctly ruled that Tucker lacks Article III standing.

The Court should affirm on that ground and remand for entry of a judgment dismissing the case for lack of jurisdiction.[12]

**B. Tucker's Claim is Barred by Kansas' 10-Year Statute of Repose**

As the district court correctly held, Kansas' statute of repose (K.S.A. § 60-513(b)) bars Tucker's claims against Harcros. App. 354. Section 60-513(b) provides "in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action." Section 60-513(b) applies to toxic tort claims like Tucker's. *Gilger v. Lee Const., Inc*., 249 Kan. 307, 311, 820 P.2d 390, 394 (1991); *Black v. Union Pac. R.R. Co.*, No. 23-cv-1218, 2024 WL 1604620, at *3 (D. Kan. Apr. 12, 2024).[13] "The statute of repose operates as a general grant of immunity against claims arising more than 10 years after the defendant's actions and abolishes a cause of action even if it has not yet accrued." *O'Neill v. Dunham*, 41 Kan.App.2d 540, 544, 203 P.3d 68, 71 (2009) (citations omitted). Section 60-513(b) "guarantees tortfeasors' safety from liability if an action commences more

---

[12] Harcros agrees that lacking Article III jurisdiction, the Court cannot rule on the merits of Tucker's claim. *Brereton v. Bountiful City Corp.,* 434 F.3d 1213, 1216-17 (10th Cir. 2006); *see also* AOB, 26-27. The district court did not enter a separate judgment after Tucker filed her notice of appeal. So upon affirming the district court on the Article III standing issue, the Court may remand with directions to enter a judgment of dismissal without prejudice.

[13] Kansas' statutes of limitation and repose govern this case over which the district court and this Court exercise diversity jurisdiction. *Burnham v. Humphrey Hosp. Reit Tr., Inc*., 403 F.3d 709, 712 (10th Cir. 2005) ("A federal court sitting in diversity applies state law for statute of limitations purposes.").

than 10 years after the causative event occurred." *Black*, 2024 WL 1604620, at *3 (fn. omitted).

### 1. Tucker was Last Exposed to the Plant's Emissions in 2006, Well More Than 10 Years before She Sued

"As evident from § 60-513(b), statutes of repose run not from the time a cause of action accrues but rather from 'the time of the act giving rise to the cause of action.'" *Id.* Here, the "act giving rise to" Tucker's claim is Harcros' plant's alleged emission of toxic chemicals to which Tucker claims she was exposed, creating the supposed need for her to undergo non-routine medical testing. I App. 20-21 ¶¶ 17-21, I App. 34 ¶ 80, I App. 45 ¶ 131, I App. 51 ¶ 143, I App. 58 ¶ 174, I App. 59 ¶¶ 176, 180.

According to the complaint, Tucker was exposed to the plant's allegedly toxic emissions prenatally before her birth in 1977 and from then until 2006 while she still lived within 1.5 miles of the plant. I App. 17 ¶¶ 8, 9, I App. 20-21 ¶¶ 16-19. The complaint does not allege that Tucker was exposed to the plant's emissions at any time after 2006. Thus, Harcros' last alleged act giving rise to Tucker's claim could not have occurred after 2006, as the complaint does not allege that Tucker was exposed to any emissions thereafter. The interval between that alleged last act giving rise to Tucker's claim and the filing of this suit is 20 years. As that interval exceeds the 10-year statute of repose in K.S.A. § 60-513(b), Tucker's claim is time-barred

and was properly dismissed.[14]

### 2. Tucker's Arguments Do Not Circumvent the Statute of Repose

Tucker urges reversal, but none of her arguments permit her to escape the Statute of Repose.

#### a. On Its Face, The Complaint Shows Tucker's Claim is Time-Barred

Tucker first tries to overcome the statute of repose by arguing that her complaint does not sufficiently reveal when Harcros' last act occurred. Thus, she maintains it is impossible to ascertain when the 10-year statute of repose period began. AOB, 28-29. She is wrong.

Tucker points to allegations about emissions in 2020, 2022 and 2025. AOB, 28. But those acts do not give rise to *Tucker's* claim because the complaint does not allege that she was exposed to the plant's emissions at any time in the current decade. Emission without exposure does not give rise to a claim—even the medical monitoring claim that Tucker attempts to allege.

Next Tucker says her move away from the exposure area in 2006 was not itself the act giving rise to her claim. AOB, 28. That is a strawman argument.

---

[14] *See Black*, 2024 WL 1604620, at *5 (The toxic spills "of which Plaintiffs complain occurred well over 10 years ago, triggering the statute of repose in this case."); *see also Klose v. Wood Valley Racquet Club, Inc*., 267 Kan. 164, 167-68, 975 P.2d 1218, 1222 (1999) (The trial court correctly dismissed personal injury claims when defendant's acts creating the hazard occurred more than 10 years before plaintiff sued).

Harcros has never argued that Tucker's claim arises from any of her own acts.

Finally, Tucker "presumes" that "Harcros seeks for the court to *infer* from this allegation that she has had no exposure to EtO from the Facility since 2006" and argues that inferences must be drawn in her favor on a motion to dismiss. AOB, 28. Nonsense. No inference is needed. Tucker must affirmatively allege all the elements of her claim—one of which is exposure to toxic emissions. The complaint does so. As already stated, the complaint alleges exposure prenatally and through 2006. I App. 17 ¶¶ 8, 9, I App. 20-21 ¶¶ 16-19. If Tucker had been exposed at any later time, the complaint would have so alleged. It does not. It certainly does not allege any facts from which anyone could plausibly conclude that *Harcros* was somehow responsible for any future exposure. Nor has Tucker suggested that she could truthfully allege any later exposure if granted leave to amend. "[W]hen the dates given in the complaint make clear that the right sued upon has been extinguished, the plaintiff has the burden of establishing a factual basis for tolling [or otherwise avoiding] the statute." *Aldrich v. McCulloch Props., Inc.,* 627 F.2d 1036, 1041 n. 4 (10th Cir. 1980) (citations omitted). Tucker has not done so here.

**b. There is No Reasonable Doubt about What Acts Give Rise to Tucker's Claim**

Tucker next insists we cannot know what "act" gives rise to her claims. She argues "a court cannot sensibly apply the statute of repose without understanding the nature of medical monitoring under Kansas law." AOB, 29-30. After all, she says,

some claims accrue based on later-in-time events. As an initial matter, there is nothing to understand—the nature of medical monitoring claims in Kansas is nonexistent, as discussed. Tucker simply wants to convince the Kansas Supreme Court that the law should be otherwise. But even interpreting her claim charitably, there is no doubt about what acts give rise to Tucker's claim and thus start the statute of repose period. "[T]he wrongful act is the act of the defendant. Once it takes place the [wrong] has occurred," and the statute of repose period starts. *Nida v. Am. Rock Crusher Co.*, 253 Kan. 230, 238, 855 P.2d 81, 86 (1993).[15]

That rule has been applied repeatedly to claims for injuries due to asbestos or other hazardous or toxic materials. *See id.*, 253 Kan. at 237, 855 P.2d at 85-86 (describing application of § 60-513(b) to an asbestosis claim); *Black*, 2024 WL 1604620, at *3, 5 (spills and leaks of hazardous chemicals).

Tucker's attempt to invoke a "continuing duty" for Harcros to avoid the statute of repose also lacks merit. AOB, 30. Another court in the District of Kansas has squarely rejected that position. That court reasoned:

> [T]he only continuing "duty" Plaintiffs ascribe to Defendant is a duty to remediate any harms caused by the spill.

---

[15] This is neither a trespass action nor a wrongful death suit, so *Nida*, 253 Kan. 230, 855 P.2d 81 and *Martin v. Naik*, 297 Kan. 241, 254, 300 P.3d 625, 633 (2013), both cited by Tucker, AOB, 29-30 are easily distinguishable. Moreover, *Martin* involved accrual for statute of limitations purposes, not the starting point of the statute of repose, as was made clear by *Martin's* quotation from *Natilini. Martin,* 297 Kan. 254, 300 P.3d at 633 (*quoting Natalini v. Little,* 278 Kan. 140, 143, 92 P.3d 567, 569 (2004)).

> Essentially, Plaintiffs would create a "duty" upon the part of any tortfeasor to remedy the harm they have caused. And failure to fulfill that duty would constitute a new "act" which could subject the tortfeasor to liability. Creating such a duty would effectively erase all statutes of repose because defendants would be liable for acts until … they have remedied the harm resulting from that act. This would eradicate any "immunity" from past acts, undermining the entire purpose for statutes of repose.

*Black,* 2024 WL 1604620, at *5.

#### c. The Kansas Product Liability Act does Not Except Tucker's Claim from the Statute of Repose

Tucker also argues the KPLA, and specifically K.S.A. §§ 60-3303(d)(1) and 60-3303(b)(2)(D), except her claim from § 60-513(b)'s 10-year statute of repose. AOB, 31-34. Not so. The reason is simple: Tucker's claim is not a "product liability claim," nor is Harcros a "product seller" or "manufacturer" as the KPLA defines those terms. While all three definitions may be broad in some respects, they are all limited by their references to "the relevant product."[16]

The "relevant product" in a product liability case is the product that has

---

[16] K.S.A. § 60-3302, subsection (a) defines "product seller" as "any person or entity that is engaged in the business of selling products, whether the sale is for resale, or for use or consumption. The term includes a manufacturer, wholesaler, distributor or retailer ***of the relevant product*** …" Subsection (b) defines "manufacturer" to include "a product seller who designs, produces, makes, fabricates, constructs or remanufactures ***the relevant product*** or component part ***of a product before its sale*** to a user or consumer." And subsection (c) defines "product liability claim" as including "any claim or action brought for harm caused by the manufacture, … ***of the relevant product***." (All emphasis added.)

injured the plaintiff. The first element of a product liability claim is that "the [plaintiff's] injury resulted from a condition of the product." *Samarah v. Danek Med., Inc.*, 70 F. Supp. 2d 1196, 1202 (D. Kan. 1999); *Jenkins v. Amchem Prods., Inc.*, 256 Kan. 602, 630, 886 P.2d 869, 886 (1994); *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 54, 661 P.2d 348, 360 (1983). Here, Tucker doesn't allege she was harmed by a product. She claims she could be, sometime and somehow, be harmed by the alleged emission of EtO and other toxic chemicals from Harcros' plant. I App. 16 ¶¶ 1-3, I App. 21 ¶¶ 20, 21, I App. 34 ¶ 80, I App. 51 ¶ 143, I App. 59 ¶ 176. The complaint doesn't allege that Harcros manufactures or sells EtO or the other chemicals that Tucker claims she was exposed to. Instead, she alleges only that Harcros uses EtO, manufactured by others, in "ethoxylation" processes to manufacture other products which Tucker does not claim she was exposed to.[17] In other words, the "relevant products" for Tucker's claim are the emissions which Harcros did not manufacture or sell but which are merely byproducts of its manufacture of its other chemical products.

[17] *See* I App. 43 ¶ 119 ("The Harcros facility uses EtO for its use in "ethoxylation", a chemical process in which ethylene oxide reacts with alcohols, acids, or other substrates to create ethoxylates. These compounds are the building blocks for a wide range of commercial and household products, including detergents, surfactants, emulsifiers, wetting agents, dispersants, and antifoam agents. By design, they lower surface tension and allow oil and water to mix more easily, which makes them highly effective in cleaning products, industrial formulations, and personal care items.").

Because Harcros did not manufacture or sell the relevant products, it is not a "product seller" or a "manufacturer" as the KPLA defines those terms. *See* p. 30, n. 16 above (*quoting* K.S.A. § 60-3302(a), (b)). For the same reason, Tucker's claim is not a "product liability claim" within K.S.A. § 3302(c)'s definition. *Id.* It is not a claim for "harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling ***of the relevant product.***" The relevant product here—the product harming plaintiff—is a toxic emission.

Two cases interpreting § 60-3302(a)'s definition of "product seller" prove the point. In *Stanley v. ConocoPhillips Pipe Line Co*., 451 F. Supp. 2d 1286 (D. Kan. 2006), plaintiff was injured by the fuel loading arm she used to put fuel in her truck at defendant's fueling terminal. *Id.* at 1287. "Although defendant sold fuel, it was not selling the loading arm itself. Defendant was not a product seller." *Id.* at 1289. *Stanley* cites and relies on *Gietzen v. Quiet Thunder Inv., LLC*, No. 88,449, 2003 WL 22053352 (Kan. App. 2003). "In *Gietzen*, the plaintiff's car was damaged by a 'car washing apparatus' at a self-serve car wash. *Id*. at * 1. The Kansas Court of Appeals noted that while the car wash owner sold water, soap, and wax, it was not a products seller relating to the apparatus. *Id*. at *4." *Stanley*, 451 F. Supp. 2d at 1288-1289.

So too in this case. Harcros did not manufacture or sell the allegedly toxic

chemical emissions its chemical plant that Tucker claims may harm her in the future. Harcros is not a "manufacturer" or "product seller" of those "relevant products"—the emissions. And Tucker's claim is not a "product liability claim" arising from manufacture or sale of those emissions.

For that reason, neither § 60-3303(b)(2)(D) nor §60-3303(d)(1) apply to Tucker's claim. Section 60-3303(b)(2)(D) creates an exception to subsection (a)(1) of the same section which otherwise absolves a "product seller" of "liability in a product liability claim" if "the harm was caused after the product's 'useful safe life' had expired." Since Harcros is not a "product seller" and Tucker does not bring a "product liability claim," neither subsection (a)(1)'s "useful safe life" limitation nor subsection (b)(2)(D)'s exception to it apply to Tucker's claim.

Similarly, § 60-3303(d)(1) excepts only "a product liability claim against the product seller" from § 60-513(b)'s 10-year statute of repose. Since Tucker's claim is not a "product liability claim" and Harcros is not a "product seller," § 60-3303(d)(1) does not apply.

The legislative history of § 60-3303(d)(1) confirms this interpretation of its and § 60-3302's words. As detailed in *Koch v. Shell Oil Co.*, 820 F. Supp. 1336, 1341-42 (D. Kan. 1993),[18] as originally proposed, the bill would, indeed, have

---

[18] This Court reversed the district court's opinion on other grounds without suggesting that it had misread the latent disease exception's legislative history. *Koch v. Shell Oil Co.,* 52 F.3d 878 (10th Cir. 1995).

amended § 60-513(b) (the general statute of repose), but in the Senate its scope was narrowed, and the exception was added only to § 60-3303 (the KPLA), rather than § 60-513. "The fact that the legislature decided to make the amendment part of the [KPLA] indicates a clear intent to limit the exception to a specific class of tort actions—product liability claims." So does the fact that the measure was introduced in response to *Tomlinson v. Celotex*, 244 Kan. 474, 770 P.2d 825 (1989), a case involving latent asbestosis caused by Celotex's asbestos-containing products. *Koch*, 820 F. Supp. at 1341 & n. 8.

Nor has the KPLA been applied outside the realm of what are commonly called product liability claims, confirming that § 60-3302's definitions have not been given the sweeping breadth that Tucker advocates. *See, e.g.*, *Jenkins v. Amchem Prods., Inc.,* 256 Kan. 602, 630, 886 P.2d 869, 886 (1994) (A product liability claim is based on the defective condition of a product); *Savina v. Sterling Drug, Inc*., 247 Kan. 105, 114, 126, 795 P.2d 915, 923, 931 (1990) (same); *Patton v. Hutchinson Wil-Rich Mfg. Co.,* 253 Kan. 741, 756, 861 P.2d 1299, 1311 (1993) (The KPLA's purpose was "to consolidate all product liability actions, regardless of theory into one theory of legal liability.").[19] By contrast, Kansas courts have repeatedly applied

---

[19] *Harding v. K.C. Wall Prods., Inc*., 250 Kan. 655, 656, 831 P.2d 958, 960 (1992), which Tucker cites, AOB, 33, involved just such a product liability claim. The plaintiff claimed her husband had died of mesothelioma caused by the defendant's asbestos-containing wallboard products which the husband's employer had bought and the husband used. *Id.*

§ 60-513's ten-year statute of repose to environmental contamination claims like Tucker's. *See City of Neodesha v. BP Corp. N. Am., Inc.*, 295 Kan. 298, 320-21 (2012); *Black*, 2024 WL 1604620, at *3-9.

None of Tucker's attempts to avoid § 60-513(b)'s 10-year statute of repose has any merit. That statute bars her claim as it was filed 20 years after her last exposure to the allegedly toxic emissions which is what she claims requires her to undergo non-routine medical testing.

### C. The Court Should Deny Tucker's Request to Certify Questions to The Kansas Supreme Court

For several reasons, the Court should deny Tucker's request to certify issues to the Kansas Supreme Court. Under Kansas law, the "Kansas supreme court may answer questions of law certified to it by … a court of appeals of the United States … if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the court of appeals of this state." Kan. Stat. Ann. § 60-3201. This Court, in turn, will certify when the issue "may be determinative of the case at hand" and is so "novel that [it] feel[s] uncomfortable attempting to decide it without further guidance." *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007). Constrained by these standards, Tucker's request should fail.

### 1. The Court Should Not Allow Tucker to Seek a Fast Pass to Kansas Supreme Court Review

As an initial matter, the Court should not countenance, let alone aid, Tucker's transparent effort to jump the line to leverage federal courts' diversity jurisdiction and the Kansas Supreme Court's authority to accept certified questions to secure priority access to that court's review.

Before they filed this action, Tucker's attorneys knew that there was no Kansas state court or legislative enactment allowing a suit for medical monitoring absent a manifested bodily injury. Tucker's complaint alleges that her claim "is brought under the emerging legal standard articulated by many states" with an appended footnote citing decisions from seven states as well as one state statute. I App. 58 ¶ 175 & n. 50. Notably missing from that list is any Kansas decision or statute.

Yet Tucker's attorneys chose to raise a novel issue of state law in federal court. They did so despite the well-recognized fact that "[f]ederal courts sitting in diversity must 'proceed with caution' when making pronouncements about state law, and are in a 'particularly poor position' to endorse a 'policy innovation' in a state's law absent an 'authoritative signal from the legislature or the courts' of that state. *Jensen v. United States Tennis Ass'n*, No. 23-15757, 2025 WL 707447, at *2 (9th

Cir. Mar. 5, 2025) (citations omitted).[20] Federal courts' unwillingness to speculate on any trends in state law "applies with special force to a plaintiff in a diversity case who has chosen to litigate his state law claim in federal court." *Shaw v. Republic Drill Corp.,* 810 F.2d 149, 150 (7th Cir. 1987); *Afram Export Corp. v. Metallurgiki Halyps, S.A.,* 772 F.2d 1358, 1370 (7th Cir. 1985).

Tucker's attorneys quickly revealed their reason for choosing a seemingly unfavorable forum. They saw federal court as a means for quicker access to the Kansas Supreme Court than taking the normal course of litigating their way through Kansas' court system. That strategy is clearly shown in Tucker's oppositions to defendants' motions to dismiss, which principally urged certification to the Kansas Supreme Court rather than arguing about the merits of Tucker's claim or the statute of repose defense to it. I App. 262-276, II App. 286-300.

In this Court, Tucker's attorneys have followed the same strategy of seeking to hitch a quick ride to the Kansas Supreme Court. They have not asked *this* Court to decide the issue they say is determinative. "Does Kansas recognize medical

---

[20] *See also Jeanty v. Big Bubba's Bail Bonds*, 72 F.4th 116, 120 (5th Cir. 2023); *Carhartt, Inc. v. Innovative Textiles, Inc*., 998 F.3d 739, 745 (6th Cir. 2021); *Salinero v. Johnson & Johnson*, 995 F.3d 959, 969 (11th Cir. 2021); *Combs v. Int'l Ins. Co*., 354 F.3d 568, 578 (6th Cir. 2004); *Lexington Ins. Co. v. Rugg & Knopp, Inc*., 165 F.3d 1087, 1092 (7th Cir. 1999); *Affiliated FM Ins. Co. v. Trane Co.*, 831 F.2d 153, 155 (7th Cir. 1987); *Dayton v. Peck, Stow & Wilcox Co*., 739 F.2d 690, 694 (1st Cir. 1984); *Rhynes v. Branick Mfg. Corp.*, 629 F.2d 409, 410 (5th Cir. Unit A 1980).

monitoring as an available remedy absent manifestation of present bodily harm?" appears only in the list of issues Tucker seeks to have certified to the Kansas Supreme Court, not in the "Statement of the Issues" for this Court's review. *See* AOB, 3, 41.

Congress did not enact 28 U.S.C. § 1332 to permit litigants with state-law claims a shorter road to review in their own states' supreme courts. As this Court has repeatedly held, a plaintiff who has invoked federal jurisdiction by suing in federal district court "finds [her]self 'in a somewhat awkward position to now claim that the federal judge misunderstood' Kansas law." *Lawson v. Spirit AeroSystems, Inc.*, 135 F.4th 1186, 1211 (10th Cir. 2025); *Colonial Park Country Club v. Joan of Arc*, 746 F.2d 1425, 1429 (10th Cir. 1984); *see also Cantwell v. Univ. of Massachusetts*, 551 F.2d 879, 880 (1st Cir. 1977). The "awkward" position is even more untenable when the suit was brought in federal court only to pave a quicker path to the state supreme court.

Tucker filed this action in federal court. Federal courts can—and do—regularly answer challenging state law questions. There is no question that Kansas has never before recognized a claim like Tucker's, as the district court found. Setting aside waiver, this Court can review that issue. But it should not permit Tucker to use the certification process to seek to *make* new law.

### 2. This Appeal can be Resolved on Other Grounds so the Issues for Certification are Not Determinative

When this Court can resolve an appeal on an alternative ground, an unsettled question of state law is not "determinative" of the case and so should not be certified. *See United States v. Jones*, 512 F. Supp. 2d 1193, 1195 (D. Kan. 2007); *Boyter v. Comm'r*, 668 F.2d 1382, 1386 (4th Cir. 1981).[21]

As shown in Parts A and B of Argument, this appeal can and should be resolved either because Tucker lacks Article III standing or because her claim is barred by Kansas' statute of repose. If the Court affirms the district court's ruling on Article III standing, it cannot certify any question to the Kansas Supreme Court. *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 518 (5th Cir. 2015) ("If we lack jurisdiction, we can neither certify a controlling legal question to a state court nor resolve the merits ourselves."); *see also Husky Ventures, Inc. v. B55 Investments, Ltd.*, 911 F.3d 1000, 1010 (10th Cir. 2018) (dismissing motion to certify as moot when the court lacks appellate jurisdiction).

If the Court affirms the dismissal on statute of repose grounds, there will be no reason to certify any question to the Kansas Supreme Court. Far from being "determinative," that court's answers to Tucker's proposed questions would be irrelevant. *See Lawson,* 135 F.4th at 1211 ("[C]ertification is only appropriate where

---

[21] Under K.S.A. 60-3201, the Kansas Supreme Court may answer only certified questions "***which may be determinative of the cause***." (Emphasis added.)

the question is 'dispositive.'"). If Tucker's suit is time-barred, it makes no difference whether Kansas would otherwise allow her claim for medical monitoring in the absence of a manifested injury.

### 3. Kansas Caselaw and Statutes Provide a Reasonably Clear and Principled Course to Resolution of the Medical Monitoring Issue Tucker Seeks to Have Certified

This Court applies "judgment and restraint before certifying" and limits certification to issues that are "sufficiently novel that we feel uncomfortable attempting to decide it without further guidance." *Pino,* 507 F.3d at 1236; *Cahn v. Word*, 798 Fed. Appx. 244, 253 (10th Cir. 2020). When the Court sees "a reasonably clear and principled course" from "sufficient sources of state law—statutes, judicial decisions, attorney general's opinions," it does not certify, but resolves state law issues on its own. *Sullivan v. Nationwide Affinity Ins. Co. of Am*., 842 Fed. Appx. 251, 253 (10th Cir. 2021); *Pino*, 507 F.3d at 1236; 17A Wright & Miller, Fed. Prac. & Proc. Juris. § 4248 & n. 49 (3d ed.).

In Kansas, as in many other states, "it is a fundamental princip[le] of [negligence] law that recovery may be had only where it is shown with reasonable certainty that damage was suffered" and was caused by the defendant's negligent act or omission. *Hoard v. Shawnee Mission Med. Ctr.*, 233 Kan. 267, 277, 662 P.2d 1214, 1221 (1983). "Recovery may not be had where the cause of the injury is too remote and speculative and where the alleged resulting damages are too conjectural

and speculative to form a sound basis for measurement." *Id.*, (*citing Buck v. Miller Amusement Co.,* 166 Kan. 205, 209, 200 P.2d 286 (1948)); *see also Bridges v. Bentley by Bentley,* 244 Kan. 434, 441, 769 P.2d 635, 641 (1989) ("Recovery [on a negligence claim] may not be had where the alleged damages are too conjectural or speculative to form a basis for measurement.")

This is precisely the same bedrock principle of American tort law that has led many other states recently to reject claims for medical monitoring in the absence of manifested bodily injury. *See Hinton,* 813 So. 2d at 829, 831-32; *Smith,* 2025 COA 85, ¶ 31, 581 P.3d at 1227; *Baker*, 304 A.3d at 194, 196; *Berry*, 2020 IL 124999, ¶¶ 30, 31, 33, 181 N.E.3d at 687-88; *Henry*, 473 Mich. at 76, 701 N.W.2d at 690; *Caronia*, 22 N.Y.3d at 446, 5 N.E.3d at 14; *Lowe*, 344 Or. at 410, 183 P.3d 184; *see also Bridgestone/Firestone,* 288 F.3d at 1017 ("No injury, no tort, is an ingredient of every state's law.").

Kansas' Silica and Asbestos Claims Act provides even more guidance, emphasizing the state's continued commitment to the "no injury, no tort" rule. The Act defines both "silica claim" and "asbestos claim" as including claims for the "costs of medical monitoring." K.S.A. § 60-4901(c), (hh). It then provides that "[p]hysical impairment of the exposed person shall be an essential element in any civil action alleging a silica or asbestos claim," and further states that neither a silica claim nor an asbestos claim (other than one based on mesothelioma) may be brought

"based on a nonmalignant condition in the absence of a prima facie showing of physical impairment as a result of a medical condition." K.S.A. § 60-4902(a), (b), (d), (e)(1)(B). In other words, to recover costs of medical monitoring, the plaintiff must show either that he or she has mesothelioma or that he or she suffers from some other medical condition that causes a physical impairment of his or her body.

The Silica and Asbestos Claims Act was enacted in 2006. L. 2006, ch. 196. It stands as a recent reiteration of Kansas' commitment to the rule that there is no recovery in negligence or related torts without manifested physical injury. And it applies that rule to claims for the cost of medical monitoring.

Thus, together Kansas caselaw and statutes provide this Court clear guidance and "a reasonably clear and principled course" to resolution of the primary issue that Tucker wishes to have certified. Both caselaw and statutes teach that Kansas law requires manifestation of physical harm to the body before allowing recovery in negligence—even for the cost of medical monitoring.

So there is no need to impose on the Kansas Supreme Court to answer that question.

## V.

## CONCLUSION

For the reasons stated above, the Court should affirm the appealed order and deny the motion to certify questions to the Kansas Supreme Court.

DATED: September 28, 2026

STINSON LLP

By: /s/ Jan T. Chilton
JAN T. CHILTON

Attorneys for Defendant and Appellee
Harcros Chemicals Inc.

## STATEMENT REGARDING ORAL ARGUMENT

Harcros respectfully requests oral argument because this appeal presents consequential questions of federal standing and Kansas law.

DATED: September 28, 2026

STINSON LLP

By: /s/ Jan T. Chilton
JAN T. CHILTON

Attorneys for Defendant and Appellee
Harcros Chemicals Inc.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the type-volume limitation of Fed. R. App. P. 5(c)(1). The document contains 10,985 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman type style and 14 point type.

DATED: September 28, 2026

STINSON LLP

By: Jan T. Chilton

JAN T. CHILTON

Attorneys for Defendant and Appellee
Harcros Chemicals Inc.

## CERTIFICATE OF SERVICE

I certify that on September 28, 2026, I electronically filed the foregoing Answer Brief of Defendant/Appellee Harcros Chemicals Inc. with the Clerk of Court using the CM/ECF system. All participants in this case are registered CM/ECF users and will be served through that system.

DATED: September 28, 2026

STINSON LLP

By: Jan T. Chilton
JAN T. CHILTON

Attorneys for Defendant and Appellee
Harcros Chemicals Inc.