NO. 26-3090

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

VANESSA TUCKER

*Plaintiff-Appellant*

v.

HARCROS CHEMICALS, INC.

*Defendant-Appellee*

On Appeal from the United States District Court
for the District of Kansas No. 2:25-cv-2569

Honorable Kathryn H. Vratil, District Judge

# PLAINTIFF-APPELLANT'S REPLY BRIEF

Robert L. Kinsman
KRAUSE & KINSMAN GROUP, LLC
93 Francisco Escudero #1002
Dorado, Puerto Rico, 00646
robert@krauseandkinsman.com

Noah Heinz
PAK HEINZ PLLC
20 F St. NW, 7th Fl.
Washington, DC 20001
(202) 505-6354
noah.heinz@pakheinz.com

*Counsel for Plaintiff-Appellant*

October 19, 2026

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. Tucker Has Alleged Standing. ........ 2

A. Tucker's Injury Satisfies *TransUnion*. ........ 2

B. The Merits Question Of Whether Kansas Recognizes Medical Monitoring Cannot Defeat Standing. ........ 8

II. The District Court Erred In Finding The Claims Time-Barred. ........ 9

A. The Complaint Does Not Plead A Time-Barred Claim. ........ 9

B. The "Act Giving Rise To The Cause Of Action" Depends Deeply On The Cause Of Action. ........ 10

C. The KPLA Excepts This Claim From The Statute of Repose. ........ 11

1. Tucker's Claims Fall Under the KPLA. ........ 11

2. The KPLA's Exceptions Apply. ........ 14

III. The Court Should Certify Three Questions To The Kansas Supreme Court. ........ 15

A. That Tucker Filed In Federal Court Is No Obstacle To Certification. ........ 15

B. The Three Questions Are Determinative. ........ 17

C. There Is No Authoritative Kansas Precedent On Any Of The Three Questions. ........ 17

CONCLUSION ........ 20

CERTIFICATE OF COMPLIANCE ........ 21

CERTIFICATE OF SERVICE....................................................................22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Croda Inc.*,
304 A.3d 191 (Del. 2023) .......... 19

*Black v. Union Pac. R.R. Co.*,
No. 23-cv-1218, 2024 WL 1604620 (D. Kan. Apr. 12, 2024) .......... 10

*Black v. Union Pac. R.R. Co.*,
No. 23-cv-1218, 2025 WL 579827 (D. Kan. Feb. 21, 2025) .......... 10

*Bonnette v. Triple D Auto Parts Inc.*,
409 P.3d 865 (Kan. Ct. App. 2017) .......... 10

*Bridges v. Bentley*,
769 P.2d 635 (Kan. 1989) .......... 17

*Caronia v. Philip Morris USA, Inc.*,
5 N.E.3d 11 (N.Y. 2013) .......... 19

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 6

*Conservation L. Found., Inc. v. Acad. Express, LLC*,
129 F.4th 78 (1st Cir. 2025) .......... 5

*Fernandez v. Clean House, LLC*,
883 F.3d 1296 (10th Cir. 2018) .......... 9

*Gaumer v. Rossville Truck & Tractor Co.*,
257 P.3d 292 (Kan. 2011) .......... 11

*Gowing v. McCandless*,
547 P.2d 338 (Kan. 1976) .......... 10

*Hinton ex rel. Hinton v. Monsanto Co.*,
813 So. 2d 827 (Ala. 2001) .......... 19

*In re Paoli R.R. Yard PCB Litig.*,
916 F.2d 829 (3d Cir. 1990) .......... 2, 6

*Jenkins v. Amchem Prods., Inc.*,
886 P.2d 869 (Kan. 1994) .......... 12

*Kerns v. G.A.C., Inc.*,
875 P.2d 949 (Kan. 1994) .......... 10

*Klaus v. Fox Valley Sys., Inc.*,
912 P.2d 703 (Kan. 1996) .......... 19

*Koch v. Shell Oil Co.*,
52 F.3d 878 (10th Cir. 1995) .......... 15

*Lawson v. Spirit AeroSystems, Inc.*,
135 F.4th 1186 (10th Cir. 2025) .......... 16

*Longenecker v. Zimmerman*,
267 P.2d 543 (Kan. 1954) .......... 5

*Martin v. Naik*,
300 P.3d 625 (Kan. 2013) .......... 10

*Metro-N. Commuter R.R. Co. v. Buckley*,
521 U.S. 424 (1997) .......... 4, 5

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) .......... 7

*Morris v. Dines Mining Co.*,
256 P.2d 129 (Kan. 1953) .......... 18

*Petrella v. Brownback*,
697 F.3d 1285 (10th Cir. 2012) .......... 7

*Pino v. United States*,
507 F.3d 1233 (10th Cir. 2007) .......... 16

*Sommerville v. Union Carbide Corp.*,
149 F.4th 408 (4th Cir. 2025) .......... 2, 4, 6, 7

*Stanley v. ConocoPhillips Pipe Line Co.*,
451 F. Supp. 2d 1286 (D. Kan. 2006) .......... 12

*Steele v. Latimer*,
521 P.2d 304 (Kan. 1974) .......... 18

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 1, 2, 3, 4, 5, 6

*Walker v. BuildDirect.com Techs., Inc.*,
733 F.3d 1001 (10th Cir. 2013) .......... 16

**Statutes**

Class Action Fairness Act, 28 U.S.C. § 1332(d) .......... 15

Kan. Stat. Ann. § 60-3302 .......... 12, 13

Kan. Stat. Ann. § 60-3303(b)(2)(D) .......... 15

Kan. Stat. Ann. § 60-3303(d)(1) .......... 14

Kan. Stat. Ann. § 60-3305 .......... 12

Kan. Stat. Ann. § 60-3306 .......... 13

Kan. Stat. Ann. § 60-4902 .......... 18

**Rules**

Fed. R. Civ. P. 12 .......... 7, 9

Fed. R. Evid. 702 .......... 7

**Other Authorities**

Model Uniform Product Liability Act §§ 104-105, 44 Fed. Reg.
62,714 (Oct. 31, 1979) .......... 14

Restatement (Third) of Torts: Miscellaneous Provisions, Medical
Monitoring (Am. L. Inst., Tentative Draft No. 3, 2024) .......... 8

## INTRODUCTION

Like scores of cases filed in federal court, Tucker's seeks medical monitoring based on the emission of dangerous chemicals during a manufacturing process. The district court dismissed Tucker's claims at the threshold, concluding that she lacks *any* injury in fact, despite considerable exposure to cancer-causing chemicals that have made her need medical monitoring under an objective standard of care, because Kansas does not recognize medical monitoring as a tort. Even Harcros does not defend that reasoning, instead proffering the ambitious argument that *TransUnion LLC v. Ramirez* overruled the scores of cases that have allowed medical monitoring claims in federal court. 594 U.S. 413 (2021). Harcros is incorrect, as other cases applying *TransUnion* in the medical monitoring context confirm.

The district court also reached the merits, concluding that the Kansas statute of repose applies and that there is no cause of action for medical monitoring. On these issues, the Court should certify the questions to the Kansas Supreme Court. There is no guidance from Kansas courts on how the statute of repose applies to claims like this. Beyond that, the Kansas Product Liability Act includes exceptions that apply here as long as the claim counts as a product liability claim under the unusually broad statutory definition in that law.

## ARGUMENT

### I. Tucker Has Alleged Standing.

Harcros does not challenge traceability or redressability, and so the question of standing boils down to whether Tucker has alleged injury in fact. She has. This is not a claim for compensation for a mere risk of future injury; rather, it is a claim for monitoring costs that are needed *now* under a standard of care that will be proven at trial. As the Third Circuit has explained, "[t]he injury in an enhanced risk claim is the anticipated harm itself," while "[t]he injury in a medical monitoring claim is the cost of the medical care that will, one hopes, detect that injury." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 850-51 (3d Cir. 1990). That is why no court of appeals has denied standing for a medical monitoring claim, as the opening brief explained.

#### A. Tucker's Injury Satisfies *TransUnion*.

Harcros asks this Court to depart from decades of federal cases upholding standing by arguing that *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), wholly changed the law. In Harcros's view (citing zero cases that have agreed), "None of the cited cases, *Sommerville* included, apply *Spokeo's* or *TransUnion's* tests for Article III standing." Ans. Br. at 19. It is hard to reconcile that claim with the Fourth Circuit's opinion in *Sommerville*, which cited *TransUnion* more than 15 times and *reversed* a district court opinion which adopted the precise argument Harcros has put forward here. *See Sommerville v. Union Carbide Corp.*, 149 F.4th 408, 416 (4th

Cir. 2025), *cert. denied*, 146 S. Ct. 2677 (2026). Because Harcros relies so firmly on *TransUnion*, a brief description is warranted.

*TransUnion* was a class-action case about the Fair Credit Reporting Act. 594 U.S. at 417. The defendant, TransUnion, had inaccurately placed thousands of consumers on a list as potential matches to Office of Foreign Assets Control (OFAC) "designated nationals." *Id.* at 419. TransUnion transmitted that inaccurate information with respect to 1,853 individuals to third parties (for example, businesses running credit checks), and the Court had no difficulty concluding that those plaintiffs had standing *even without* proof about how the transmittal affected them specifically (or even whether the third-party who received the information did anything with it or read it). *Id.* at 433. With respect to the 6,332 individuals whose information *never* left TransUnion's internal database, the Court found no injury in fact. *Id.* at 439. With respect to this group, the injury could not be the inaccurate data sitting on a computer somewhere, unread, but rather the risk that the data might one day be transmitted to someone. As the Court explained: "*in a suit for damages*, the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a *separate concrete harm*." *Id.* at 436 (emphasis added). This case is different in multiple respects, which is, again, why there are so many cases upholding standing for medical monitoring cases, and no published cases that have held otherwise.

First, here, the exposure has already happened. As *Sommerville* explained, "*This* injury is no less concrete than the injury suffered by the 1,853 class members in *TransUnion* whose credit reports had *actually* been provided to third-party businesses and who had suffered 'concrete reputational harm.'" 149 F.4th at 420 (quoting 594 U.S. at 417). Much like *Sommerville*, the allegation here is not that Harcros has dangerous chemicals that *might* someday be released (as with the inaccurate OFAC list TransUnion held), but instead that Harcros's dangerous chemicals have *already* been emitted (as with the inaccurate OFAC list TransUnion disseminated). To be sure, there is some question of how the emission will affect Tucker and the proposed class (which cancer, and how likely), but that is more like the question of how the transmission of the inaccurate OFAC list would affect each plaintiff (if at all).

Second, unlike the intangible reputational harm alleged in *TransUnion*, the harms here are physical and bodily: physical exposure to a dangerous chemical that causes disease. That makes the common law analogs abundant: trespass, battery, and nuisance have always treated even non-injurious *touching* of one's body or property to be actionable.[1] That is why the First Circuit explained that under

[1] Harcros implausibly suggests that "there is no historical analogue" by quoting *Metro-N. Commuter R.R. Co. v. Buckley*, 521 U.S. 424 (1997), Ans. Br. at 16 & n.5, but *Buckley* says nothing like that. The full quotation on pages 440-41 is as follows: "cases authorizing recovery for medical monitoring in the absence of physical injury

*TransUnion*, "'breathing and smelling polluted air' are both injuries-in-fact, even when unaccompanied by additional associated harms." *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 87-88 (1st Cir. 2025). This mirrors what the Kansas Supreme Court explained long ago, "[f]rom every direct invasion of the *person* or property of another, the law infers some damage, without proof of actual injury." *Longenecker v. Zimmerman*, 267 P.2d 543, 545 (Kan. 1954) (emphasis added). An "invasion" of a plaintiff's "person" can occur even without separate injury, and, at minimum, occurred here.

Third, *TransUnion* limited its future-risk-holding to suits "for damages" where there is no "separate concrete harm," 594 U.S. at 436, but this is *not* a suit for damages, and the need for medical care is a separate concrete harm. In other words, *TransUnion* was addressing what the Third Circuit called "an enhanced risk claim," where the *only* harm is the risk itself, whereas medical monitoring addresses separate

---

do not endorse a full-blown, traditional tort law cause of action for lump-sum damages—of the sort that the Court of Appeals seems to have endorsed here. Rather, those courts, while recognizing that medical monitoring costs can amount to a harm that justifies a tort remedy, have suggested, or imposed, special limitations on that remedy." *Buckley*, 521 U.S. at 440-41. No justice on the Supreme Court even hinted that the plaintiff in *Buckley* lacked Article III injury-in-fact. Rather, the Supreme Court only said that the recognized tort of medical monitoring (which provides court-supervised monitoring, not a lump sum of money) does not support an action for lump-sum damages which was sought in that case. If anything, that framing suggests that medical monitoring of the sort alleged here is within the heartland of what is allowed.

concrete harm of "the cost of the medical care that will, one hopes, detect that injury." *In re Paoli*, 916 F.2d at 850-51. Applying *TransUnion*, the Fourth Circuit explained that the injury in a medical monitoring case "is not an 'increased risk of cancer development due to the alleged EtO emissions,'" but rather the "'exposure itself' to 'environmental toxins' tortiously emitted by the Plant Owners, '[which] affect the body in ways that often do not become manifest for several years' and 'the concomitant need [to pay] for medical testing' today to mitigate an increased risk of illness which Sommerville would not bear but for the Plant Owners' actions." 149 F.4th at 419 (citations omitted).

For the same reasons, Harcros is incorrect (at 13-14) to invoke *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) for its "certainly impending" standard. There, the key flaw was that plaintiffs were speculating that United States officials were surveilling them under a specific statutory surveillance regime, but had no actual proof such surveillance was occurring at all. Here, the injury is determined by an objective medical standard of care, not "the product of their fear of surveillance." *Id.* at 417. In other words, *Clapper* was more like a plaintiff who alleged that he wears a tin-foil hat because he worries about radio waves harming his head, with no medical proof—the allegations here about the chemicals at issue will be proven with medical expert evidence and are not the mere product of fear. At the pleading stage, the "burden in establishing standing is lightened

considerably." *Petrella v. Brownback*, 697 F.3d 1285, 1292 (10th Cir. 2012). Tucker met that burden.

Harcros's attempt to distinguish *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010), appears to turn on factual distinctions of degree, which is improper for a Rule 12 motion. Ans. Br. at 12. It is hard to see why providing facts that "bees could pollinate plaintiffs' 'organic' alfalfa *and* alfalfa grown by farms using Roundup's product" is any different from alleging facts that EtO can cause cancer. *Id.* If the problem is that Harcros doubts that medical experts will be able to testify that Tucker has increased risk due to exposure that warrants monitoring as the applicable medical standard of care, it should make those arguments in a Rule 702 motion. As *Sommerville* shows, it is, at minimum, *plausible* that this could be true.[2]

[2] Harcros misreads the complaint in asserting that Tucker's risk is "one-in-a-million," Ans. Br. at 11, when the Complaint alleges much higher exposure than the low level that produced that risk. *See* App. I at 18, 36-41, 44. Quantification has never been required at the Rule 12 stage, but in any case, the lower court did not rest its opinion on that ground. If this Court decided more were necessary, it should vacate and remand to allow the lower court to review the factual allegations and allow amendment for more detail if that were required.

### B. The Merits Question Of Whether Kansas Recognizes Medical Monitoring Cannot Defeat Standing.

Harcros does not defend the district court's conflation of the existence of a cause of action with standing. *See* Ans. Br. at 23-25.[3] Rather, it now argues only that the question should be whether "Anglo-American common law more generally" recognizes a similar category of injury-in-fact. *Id.* at 24. If the question is Anglo-American common law more generally, the American Law Institute's Third Restatement should be powerful evidence. At minimum, the widespread acceptance of medical monitoring under the common law suggests that it is consonant with the basics of Anglo-American jurisprudence. *If* the Court believes it needs to know whether Kansas recognizes medical monitoring in order to assess standing, then it should certify the question to the Kansas Supreme Court to find out. Either way, if the Court determines that there is no standing, even "Harcros agrees that lacking Article III jurisdiction, the Court cannot rule on the merits of Tucker's claim," and so the Court could not fully affirm, but would need to vacate the merits rulings and "remand with directions to enter a judgment of dismissal without prejudice." Ans. Br. at 25 & n.12.

---

[3] It would not matter if Tucker invited error on this issue, since it is jurisdictional, but she of course did not, since Tucker asked the district court to certify the questions to the Kansas Supreme Court, not to hold that there is no standing.

## II. The District Court Erred In Finding The Claims Time-Barred.

Harcros's time-bar argument fails for three independently sufficient reasons: the complaint does not establish the time-bar on its face, the medical monitoring question is intertwined with the statute of repose, and the KPLA exempts Tucker's claim.

### A. The Complaint Does Not Plead A Time-Barred Claim.

A statute of repose defense is an affirmative defense that rarely succeeds on a motion to dismiss, and Harcros has not met its burden here. The phrase "affirmative defense" does not appear once in Harcros's brief, nor does Harcros distinguish *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (cited at Op. Br. at 28), nor does Harcros explain the legal standard for affirmative defenses at the Rule 12 stage. Rather, Harcros attempts to place the burden on Tucker, arguing that "Tucker must affirmatively allege all the elements of her claim—one of which is exposure to toxic emissions," and then speculates that "[i]f Tucker had been exposed at any later time, the complaint would have so alleged," Ans. Br. at 28, but there is no such burden. The date of exposure simply is not an element of any claim, and Harcros offers no facts in the complaint alleging that her exposure must have ended in 2006, or that she was not subject to later exposure. To the contrary, the Complaint alleges considerable conduct *by Harcros* that post-dates 2006, *e.g.*, App. I at 43-45, which would be peculiar if that conduct had no possible relevance to the case.

### B. The "Act Giving Rise To The Cause Of Action" Depends Deeply On The Cause Of Action.

Harcros claims that the application of the statute of repose does not depend on the contours of medical monitoring law in Kansas, but it does not cite or distinguish cases from the opening brief and its chief authority is an unpublished federal district court case. *See* Ans. Br. at 28-30. Harcros repeatedly cites *Black v. Union Pac. R.R. Co.*, No. 23-cv-1218, 2024 WL 1604620 (D. Kan. Apr. 12, 2024) (unpublished), but there is no reason to treat that obscure case as giving general principles for applying Kansas statute of repose law, and in any event the same court later rejected the defendant's statute of repose arguments after amendment, *see Black v. Union Pac. R.R. Co.*, No. 23-cv-1218, 2025 WL 579827, at *3 (D. Kan. Feb. 21, 2025) (unpublished). As for the Kansas authorities Tucker cited in her opening brief (such as *Kerns*, *Bonnette*, and *Gowing*), Harcros does not distinguish or even cite them. Harcros does purport to distinguish *Martin v. Naik* on the grounds that it "involved accrual for statute of limitations purposes," Ans. Br. at 29 n.15, but the case clearly addressed both, since (1) the key question was "the act giving rise to the cause of action" which triggered both the statute of limitations and of repose, (2) the opinion mentions "repose" more than five times, and (3) it quotes the statute of repose section of the relevant statute, including the "act giving rise to the cause of action" language. *See Martin v. Naik*, 300 P.3d 625, 633 (Kan. 2013).

What Harcros's confusion over Kansas precedents shows, more than anything, is that Kansas law is fairly complex and somewhat unsettled, which provides strong reason to certify the question to the Kansas Supreme Court.

### C. The KPLA Excepts This Claim From The Statute of Repose.

Harcros does not dispute the specific exceptions to the statute of repose, but simply disputes that this claim is covered by the KPLA at all. It is covered by the text of that statute.

#### 1. Tucker's Claims Fall Under the KPLA.

Harcros disputes the definition of "product liability claim," "product seller" and "manufacturer," but its argument rests on a conflation of the KPLA and common law product liability law. Recall that "[w]hen it comes to setting out the responsibilities and potential liabilities of a 'product seller,' the KPLA is silent. This legislative approach leaves this court and other courts no choice but to look to the substantive rights and liabilities recognized under Kansas common law for each type of product liability action." *Gaumer v. Rossville Truck & Tractor Co.*, 257 P.3d 292, 298 (Kan. 2011). Because it only constrains defenses and actions, but does not create tort law duties, its language deliberately includes far more than the common law does. For the same reason, it makes no sense to argue, as Harcros does, that "The first element of a product liability claim is that 'the [plaintiff's] injury resulted from a condition of the product.'" Ans. Br. at 31. The "elements" of a product liability

claim are neither here nor there, because they are determined by the common law, not the KPLA, and so cannot say anything about the KPLA's defined terms. The case Harcros cites is elaborating on "the doctrine of strict products liability as set out in the Restatement (Second) of Torts," not the KPLA. *Jenkins v. Amchem Prods., Inc.*, 886 P.2d 869, 886 (Kan. 1994). *Jenkins* does not even reference the KPLA.

Rather than looking to what counts as a product liability claim under the common law as Harcros suggests, the Court should start, and end, with the text of the KPLA. The KPLA includes a vast range of legal theories, including "any other substantive legal theory," and specifically "includes" without limitation "any claim or action brought for harm caused by the manufacture … installation, testing … marketing … storage or labeling of the relevant product." Kan. Stat. Ann. § 60-3302(c). It is true that the manufacturer must make *some* product, and the claim must be based on the "manufacture" of that product—rather than a different product with which it has no connection—but that does not mean the harm must derive from a defect in the product for the KPLA to apply. The statute is simply broader than the common law.[4]

---

[4] Harcros cites *Stanley v. ConocoPhillips Pipe Line Co.*, but it does not appear that anything in that case turned on section 60-3302(b). 451 F. Supp. 2d 1286 (D. Kan. 2006). The district court does not fully quote or analyze the text, and appears simply to be mistaken about the KPLA, claiming, for example, that section 60-3305 sets forth "duties to warn," when it actually provides defenses. *Id.* at 1288. The case would not have come out differently if the KPLA had applied, since the defendant

Section 60-3306 illustrates this point. Section 60-3306 specifies that a product seller "shall not be subject to liability in a product liability claim *arising from an alleged defect in a product*" where certain conditions are met. Kan. Stat. Ann. § 60-3306(a) (emphasis added). If Harcros's reading were correct, this phrase would be wholly superfluous, since on its reading *all* product liability claims arise from an alleged defect in a product. *See* Ans. Br. at 31. The Kansas legislators knew how to specify when sections in the KPLA addressed claims "arising from an alleged defect in a product," and they placed that limitation in sections 60-3306(a) and 60-3306(b), but not in the definitions in section 60-3302, deliberately making this defense apply to a subset of all product liability claims.

The phrase "relevant product" does not graft on a condition-of-the-product limitation. Rather, it simply ensures that the product at issue is not *someone else's* product. Here, Harcros makes a variety of products, and the manufacture of those "relevant products" caused harm to Tucker and the proposed class. The claim is therefore a product liability claim, and Harcros a product seller and manufacturer.

Philips, as an amicus, adds the argument that the KPLA is modeled off a different law, which defines "product" in a certain way, Philips Br. at 10, but misses

---

was not seeking to apply any statutory defenses. The question was whether the case should be analyzed under premises liability or products liability for the purposes of a duty to warn, which is answered by the common law, not the KPLA.

the most important differences. Most obviously, unlike the Model Uniform Product Liability Act, the KPLA omitted a definition of "product," suggesting the definition may be different. But much more importantly, the KPLA omitted the substantive liability sections of the law, which are sections 104 and 105. *See* MUPLA §§ 104-105, 44 Fed. Reg. 62,714 (Oct. 31, 1979). With those provisions included, a broad definition could expand liability. Without them, the KPLA was free to be much broader, because it chiefly constrained pre-existing law.

**2. The KPLA's Exceptions Apply.**

Harcros's only argument against the KPLA exceptions applying is its general protest that the KPLA does not apply at all because it is not a product seller. *See* Ans. Br. at 30-35. Assuming the Court concludes that Harcros *is* a manufacturer and product seller, and that this claim *is* a product liability claim under the KPLA, Harcros does not dispute that either exception applies.

Specifically, Harcros does not dispute that the latent disease exception would apply, *see* Kan. Stat. Ann. § 60-3303(d)(1), and has forfeited any such argument. Philips and Harcros invoke legislative history to argue that the latent disease exception applies only to product liability claims under the KPLA, but this adds nothing new. There are countless claims that fall entirely outside the KPLA, and no one contends that the latent disease exception applies there. Philips also argues that "Tucker does not allege that she presently has a latent disease awaiting discovery,"

Philips Br. at 19, but that is, of course, the point of the monitoring. She is at greater risk, and may well have a latent disease. It would make no sense to say that a claim *is* subject to the statute of repose *before* it is discovered, but then suddenly springs back and the disease becomes retroactively latent *after* it is discovered. The repose bar either applies or it does not. If the Court were unsure on this point, that is another reason to certify, since no Kansas court has ever accepted this argument.

Further, Harcros does not dispute that section 60-3303(b)(2)(D) would apply if the KPLA applies, and, again, has forfeited any such argument. Its inchoate argument that this section only has to do with a durable good's "useful safe life," Ans. Br. at 33, has been rejected. *See Koch v. Shell Oil Co.*, 52 F.3d 878, 884 (10th Cir. 1995).

## III. The Court Should Certify Three Questions To The Kansas Supreme Court.

There is no question that whether Kansas law allows medical monitoring claims is an important issue that the state supreme court should decide. There is likewise no question that in the course of making that decision, it could clarify key issues about the Kansas statute of repose. Harcros's chief arguments against certification seek to hold Tucker to an unfair standard that this Court has never accepted. The questions should be certified.

### A. That Tucker Filed In Federal Court Is No Obstacle To Certification.

It is true that Tucker filed in federal court, but given the Class Action Fairness Act, the case inevitably would have been removed had she filed in state court, and

so it saved both sides time and money to file in federal court. Harcros concocts a conspiracy theory for this ordinary litigation choice, suggesting that Tucker's attorneys had a nefarious plan to gain "quicker access" and "hitch a quick ride," Ans. Br. at 37, but never explains any problem. The Kansas Supreme Court is free to deny any request for certification, and losing in the district court then seeking certification in this Court (after addressing Article III standing) is hardly a fast lane.

Tucker requested certification to the Kansas Supreme Court at the earliest possible moment not to reveal a master plan, but simply because this Court's precedents require litigants who seek certification to attempt to do so at the earliest possible moment. That is what Tucker did. In any case, there is no rule prohibiting plaintiffs who filed in federal court from seeking certification, and such a rule has nothing to recommend it. The quotation from *Lawson v. Spirit AeroSystems, Inc.*, is one of *four* different reasons this Court denied the motion to certify, and in no case was this supposed factor a major consideration. 135 F.4th 1186, 1211 (10th Cir. 2025). This Court has certified questions in cases that plaintiffs filed in federal court. *E.g.*, *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1006 (10th Cir. 2013). Certification honors "the federal character of our judicial system, recognizing that the judicial policy of a state should be decided when possible by state, not federal, courts." *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007). It would be

odd to disregard that compelling interest any time a plaintiff files in federal court or a defendant removes.

**B. The Three Questions Are Determinative.**

Harcros does not dispute that the medical monitoring and statute of repose questions are determinative of this suit. Ans. Br. at 39-40. Rather, it argues only that *if* the Court affirms on standing or the statute of repose, then it should not *also* certify any questions. With respect to standing, that is plainly true. For the statute of repose, it is circular to say that the issue is not determinative because the Court should resolve it. Obviously, if this Court resolved the statute of repose issue, there would be nothing to certify, not because the issues are not determinative, but because they have been determined.

**C. There Is No Authoritative Kansas Precedent On Any Of The Three Questions.**

Harcros identifies no Kansas appellate decision addressing medical monitoring, and none exist. The Kansas cases it cites say nothing about the existence of a claim (or equitable relief), but instead hold simply that in proving *damages* "there must be some reasonable basis for computation which will enable the trier of fact to arrive at an approximate estimate of the amount of loss." *Bridges v. Bentley*, 769 P.2d 635, 641 (Kan. 1989). True enough, but irrelevant, and equally true under the laws of states that accept medical monitoring. Those cases say nothing about

whether a present, medically necessary expense caused by toxic exposure is actionable.

The Silica and Asbestos Claims Act confirms that the general question remains open. Ans. Br. at 41-42. Harcros emphasizes that the statute makes "[p]hysical impairment of the exposed person . . . an essential element in any civil action alleging a silica or asbestos claim." Ans. Br. at 41 (quoting Kan. Stat. Ann. § 60-4902). That requirement governs only asbestos and silica claims. If Kansas common law already barred every monitoring claim by an unimpaired plaintiff, the Legislature would not have needed to impose this more specific requirement.

Kansas courts develop the common law to meet new conditions, so the absence of a Kansas decision is a reason to ask the Kansas Supreme Court. The Kansas Supreme Court has recognized new common-law claims for toxic exposure before, explaining that "[w]e are not impressed with the thought that in order to maintain a common law action in this day and age it is necessary to find its counterpart in the English common law." *Morris v. Dines Mining Co.*, 256 P.2d 129, 132 (Kan. 1953). It has emphasized that "the development of the common law has been determined largely by the social needs of the society it was designed to serve, and that the capacity for growth and change is one of its most significant features." *Steele v. Latimer*, 521 P.2d 304, 307 (Kan. 1974). It has also declined, in answering certified questions, to recognize a new tort when it concluded that the

relevant changes in the law "have their origins in the legislature and not in decisions of courts evolving the common law." *Klaus v. Fox Valley Sys., Inc.*, 912 P.2d 703, 706 (Kan. 1996).

Harcros cites non-Kansas cases to predict what Kansas would do, but there is simply no principled way to predict whether it will be more like half of the states that have accepted it or more like the half that have not. Harcros does not even try to distinguish the many cases that have accepted medical monitoring, or to explain what is different about *those* states. The most important fact might be that at least three of the out-of-state decisions Harcros cites were only decided because a federal court certified the question. *Compare* Ans. Br. at 41 (citing *Hinton*, *Baker*, and *Caronia*) *with* Op. Br. at 36-37 (listing those cases as certified).

Harcros offered no dispute to the proposition that courts routinely certify the question of how to apply time-bars when certifying whether a cause of action exists (including for medical monitoring specifically). This Court should follow that well-established practice. The statute of repose issues in this case are complex, and turn on unsettled questions of medical monitoring law and the KPLA, on which the Kansas Supreme Court's views will be helpful on remand.

## CONCLUSION

For the foregoing reasons, the district court's order should be vacated, and questions should be certified to the Kansas Supreme Court.

Dated: October 19, 2026

Respectfully submitted,

*/s/ Noah Heinz*
Noah Heinz
PAK HEINZ PLLC
20 F St. NW, 7th Fl.
Washington, DC 20001
noah.heinz@pakheinz.com

Robert L. Kinsman
KRAUSE & KINSMAN GROUP, LLC
93 Francisco Escudero #1002
Dorado, Puerto Rico, 00646
robert@krauseandkinsman.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,830 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: October 19, 2026

*/s/ Noah Heinz*
Noah Heinz
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I certify that on October 19, 2026, I electronically filed the foregoing Reply Brief with the Clerk of Court using the CM/ECF system. All participants in this case are registered CM/ECF users and will be served through that system.

*/s/ Noah Heinz*
Noah Heinz
*Counsel for Plaintiff-Appellant*